FROST v. MARTIN et ux. (No. 8753.)

(Court of Civil Appeals of Texas. Ft. Worth. Jan. 26, 1918. On Resubmission, March 2, 1918. Rehearing Denied March 30, 1918.)

1. MINES AND MINERALS ⬥78(1)—OIL AND GAS LEASE — SINKING WELLS — "COMPLETED."

In an oil and gas lease providing that, "when a well is once begun, the drilling thereof shall be prosecuted with due diligence until same is completed," the word "completed" means

---

finished, or sunk to the depth necessary to find oil or gas in paying quantities, or to such a depth as in the absence of such oil or gas would reasonably preclude the probability of finding it at a further depth.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Complete.]

2. CONTRACTS ⬳159 — EVIDENCE ⬳515 — TECHNICAL TERMS.

Since technical words in a contract are to be interpreted as usually understood by persons in the business or profession to which they relate, expert testimony is admissible in case of a disagreement as to the meaning of such words to explain the sense in which such technical terms are generally understood in the business.

3. EVIDENCE ⬳515—OIL AND GAS LEASE—FORFEITURE.

In a suit to forfeit an oil and gas lease for failing to prosecute the drilling of a well until completion, it was error to refuse to admit testimony of an expert that the well was "completed" within the terms of the lease when driven to the depth of 2,103 feet without finding oil or gas.

Appeal from District Court, Stephens County; Joe Burkett, Judge.

Suit by O. S. Martin and wife against Fred W. Frost to cancel an oil and gas lease. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

Earl Conner, of Eastland, Carrigan, Montgomery & Britain, of Wichita Falls, and Walter L. Morris, of Albany, for appellant. W. C. Veale, of Breckenridge, and Theodore Mack, of Ft. Worth, for appellees.

BUCK, J. Suit was instituted November 23, 1916, by appellees against appellant to cancel an oil and gas lease. Plaintiffs pleaded forfeiture and abandonment. Defendant denied that any facts existed sufficient to establish either. Upon a jury trial under a general charge, a verdict and judgment was rendered for plaintiffs, from which defendant has appealed.

The lease contract between O. S. Martin and wife and Frost was dated January 20, 1915, and the portions thereof material to a determination of the questions presented on this appeal are hereafter set out, to wit:

"That the lessors, in consideration of the sum of ten ($10.00) dollars to them in hand well and truly paid by the lessee, the receipt of which is hereby acknowledged, as well as in consideration of the covenants and agreements hereinafter contained on the part of the lessee, do hereby grant, sell, convey, and lease unto the lessee all of the oil and gas in and under the following described tract of land, and the possession thereof, for the purpose of entering upon and operating thereon and removing therefrom said oil and gas, with the right to use sufficient water, gas, and oil from the premises to operate said property, with the right of ingress and egress at all times for such purposes, and all rights and privileges necessary for such operations, also the right to remove at any time all property, pipes, and improvements placed on or erected in or upon said land by the said lessee, and also the right of subdividing or transferring all or any part of the rights herein conveyed and the premises hereinafter described. * * *

"To have and to hold the same for the term of five years from the date thereof, and as much longer thereafter as oil or gas is found thereon and therein, in paying quantities. * * *

"Lessee agrees to begin operations for the drilling of a well upon the above-described premises within twelve (12) months from date hereof or thereafter pay to the lessors the sum of 25 cents per acre per annum, payable quarterly in advance until a well is commenced, or until the end of the five years' term hereof, as a rental and complete remuneration to lessors for delay. When a well is once begun the drilling thereof shall be prosecuted with due diligence until same is completed.

"Failure to perform the obligations above referred to shall render this lease null and void, except unavoidable accidents, delays and strikes shall not work a forfeiture.

"Lessors are to fully enjoy and use said premises for all purposes not in conflict with this grant."

The uncontradicted evidence shows that in pursuance of the terms of the lease a very short time after its execution Frost began to arrange for drilling a well, and that by the 1st of September, 1915, the drilling had begun. That drilling was carried on continuously night and day until a depth of 2,103 feet had been reached; this being about Christmas, 1915. Frost had expected to find oil or gas within 975 feet, as at about that depth oil had been found at Strawn, and it was thought that oil-bearing sands in the vicinity where the well was being bored in Stephens county would be found at about the same depth as at Strawn, over the line in Palo Pinto county. The drilling was continued to a depth of 1,250 feet, after striking plain sand at a depth of about 1,150 feet. A further contract with the driller was made to sink the well to a depth of 1,600 feet. No oil having been found, a third contract was made to go 1,800 feet, and a fourth to bore 2,100 feet, but the hole was in fact drilled to 2,103 feet. At this last-named depth the drilling was discontinued, and the machinery was removed and the contractor left. No oil-bearing sands had been found. At a depth of 1,200 feet salt water was struck, and it was necessary to case the well to the top to shut off the salt water. No gas or oil was discovered. Four different sands were entered. Frost had secured the co-operation of the Strawn Oil Company in the sinking of this well. It had been his intention, and he had made arrangements with said Strawn Oil Company, to drill three wells on the land. When he spoke to the officers of said Strawn Oil Company about drilling other wells, they told him that, owing to the fact that the Strawn oil-bearing sands had not been struck at a reasonable depth in this territory, it would be a little difficult to organize another company for the purpose of further prosecuting the development of the land under lease, but that they felt sure that they would be back within three months and begin drilling again.

During the interval between the cessation

of drilling and the removal of the machinery and casing, about Christmas, 1915, and the filing of this suit, which was on November 23, 1916, a number of conversations occurred between Martin and Frost, Martin insisting upon a further prosecution of the drilling, and at first demanding that Frost either drill deeper or drill other wells, or surrender his lease, and later insisting upon the surrender. On the other hand, Frost kept promising to do all in his power to get some other drilling contractor to sink a well or wells, and did enter into certain correspondence to that end. He was out of money, and offered to pay Martin "a little money if he would let the lease stand." Martin declined to accept any money, and continued to insist on the development of the leased land or the surrender of the lease, and finally demanded the cancellation of the lease and declined to give Frost any further time. The suit followed.

It will be remembered that the lease contract provided that:

The "lessee agrees to begin operations for the drilling of a well upon the above-described premises within twelve months from date thereof, or thereafter pay to the lessors the sum of 25 cents per acre per annum, payable quarterly in advance until a well is commenced, or until the end of the five years' term hereof, as a rental and complete remuneration to lessors for delay."

[1] We think it is a fair construction of this portion of the lease to hold that, if the lessee began, in good faith, the drilling of a well within the 12 months stipulated, he relieved himself from the alternative obligation to pay rental, and of the penalty of forfeiture for a failure so to do, unless there should be a lack of good faith and diligence in the prosecution of such drilling as provided in the last sentence of the paragraph from which the above quotation is taken, to wit:

"When a well is once begun, the drilling thereof shall be prosecuted with due diligence until same is completed."

There is no contention that up to Christmas, 1915, the lessee did not prosecute the drilling of the well, or of the "dry hole," with due diligence, and, if said well was "completed," as that term is used in the contract, then appellant's first assignment, directed to the failure of the court to give a peremptory instruction for the defendant, probably should be sustained. We think that in the sense the word "completed" is used in this contract it means finished, or sunk to the depth necessary to find oil or gas in paying quantities, or to such a depth as in the absence of such oil or gas would reasonably preclude the probability of finding oil or gas at a further depth. It should not be construed to mean that the lessee bound himself, under the penalty of a forfeiture, to sink a well or oil or gas in paying quantities, or, in the absence of oil or gas, to

bore through to China. It therefore became a material question as to whether the hole drilled to the depth of 2,103 feet was a "completed" well, as that word was used and understood by the parties.

[2] It is the general purpose of all rules for the construction of contracts to aid in ascertaining the intention of the parties, and, since it is a well-recognized canon of construction that technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless it is evident that they were used in a different sense (see 2 Elliott on Contracts, § 1511), we think expert testimony was admissible, in case of a disagreement as to the meaning and purport of such technical words, to explain the sense in which such technical terms were understood generally by those engaged in the business of drilling oil or gas wells. The issue was sharply drawn by the pleadings as to whether or not the hole drilled by the lessee was a "completed" well, plaintiffs contending that it was not, and defendant insisting that it was. The charge of the court instructed the jury that, if "the defendant did fail to prosecute the work upon the well in question upon said premises with due diligence, and you further believe from the evidence that said well was not completed by the defendant," etc., to find for the plaintiffs. On the other hand, the court instructed the jury to find for the defendant if they should find "that the work was prosecuted with due diligence on same until said well was completed." The court did not attempt to define the word "completed" as applied to a well; hence the jury were left without a guide or chart, except of the common experience and knowedge of mankind, to assist them in determining the sense in which the word "completed" was used by the parties to this contract.

[3] In his eleventh assignment appellant urges error to the action of the court in excluding the testimony of his witness H. A. Johnson to the effect that the well drilled by the defendant on the lands in controversy was a completed well. This witness, if he had been allowed to testify upon this question, would have testified in part as follows:

"I am acquainted with the Frost well on the Martin place, and at the time that that well was drilled there there had been no oil development in or about that section of the country. The wells at Moran are at an average depth of about 2,000 feet, and the wells in the Strawn field are of a much less depth on the average. The prospecting in the field that Mr. Frost caused a well to be bored on the Martin lease was with the hope of reaching the Strawn sand, and, those sands being a depth of not more than about 1,000 feet, it was considered that a fair test for oil was at a much less depth than 2,100 feet, the depth to which the Frost well was drilled, and, in my opinion, the Frost well was not only a fair test for development purposes, but it was a completed well as that term is generally understood by oil men."

This witness was shown to have been in the oil and gas business in Texas about six years. He testified:

"I know the depth of wells in this territory, that is, in Northwest Texas, that is, a great many of them—the average depth. I had charge of the drilling of ten wells. Our contract depth was 2,100 feet. On the average we drilled about 2,000 feet. Where we thought it would pay, we went on deeper. We did not get anything below 2,100 feet. * * * I have information regarding the drilling of the wells in the Strawn field. I know where the land on which the well in controversy is located is with reference to the Strawn field. It is north of the Strawn field, or northwest from the field, from the wells. It is northeast, I should say, from the Moran field and north of the Strawn field. * * * A year ago there was not any oil developments between the Moran oil field and the Martin tract of land in controversy. The first well at Moran was brought in about two years ago. * * * There had been wells drilled in the Moran field up to December, 1915, a large number. The average depth was 2,000 feet. There had been wells brought in or drilled in the Strawn field, about a mile from Strawn. The Strawn oil field is about 25 or 30 miles from the Martin tract of land. As to the average depth of wells in the Strawn field, I believe the first well in the Strawn field was 1,000 feet. * * * I think there are some wells in the vicinity of Thurber that are 2,000 feet. I think there was a well drilled prior to the time the well was put down on the Martin land, * * * on the Corbitt ranch, that is, about 8 or 10 miles from the Martin ranch. I do not recall the depth exactly, but it was between 1,900 and 2,000 feet."

Enough has been quoted to show that this witness qualified to testify as an expert upon the meaning of the technical words used by oil men and drillers of oil and gas wells, and we think the trial court improperly excluded this testimony, and that the error was a material one, which will call for a reversal of the judgment.

There were several objections directed to the fourth paragraph of the court's charge, complained of in appellant's second, third, sixth, seventh, eight, and ninth assignments, but we will not undertake to discuss these assignments separately but will only say that in our opinion the state of the evidence adduced on this trial did not justify a submission to the jury of the issue of defendant's failure to prosecute with diligence to completion the drilling of the well sunk on plaintiff's land, unless it can be said that the well so sunk was not a "completed" well as the term "completed" was used and understood by the parties. Upon another trial the jury may have the benefit of expert testimony upon the meaning of the word "completed" as applied to an oil or gas well, and the court will submit that issue to the jury under proper instructions.

For the reasons given, the judgment of the trial court is reversed, and the cause remanded.

Reversed and remanded.

CONNER, C. J., not sitting, serving on writ of error committee at Austin.

## On Resubmission.

BUCK, J. At the time this cause was under consideration on its first submission Chief Justice CONNER was absent, in attendance on the writ of error committee at Austin. Subsequent to the judgment heretofore rendered, January 26, 1918, Associate Justice DUNKLIN discovered that an oil lease taken by a company in which he was interested contained a provision similar to the one involved in the lease in this case, and therefore felt that he might be disqualified to sit in this case. In deference to his wishes, the former judgment was set aside February 9, 1918, and the cause set for resubmission February 22d, at which time the counsel for appellee appeared and submitted oral and written argument to sustain the contention that the judgment of the trial court should be affirmed. At this last submission, Chief Justice CONNER was present, heard the argument of counsel, and has since, with the writer, given the case a careful reconsideration. We find no reason to change the views expressed in the opinion of the court on the first hearing. Hence we adopt that opinion as expressing the conclusions of the court at this time.

The judgment of the trial court is reversed, and the case remanded for further proceedings not inconsistent with this opinion.

DUNKLIN, J., not sitting.