CHAPMAN et al. v. ELLIS et al. (No. 994.)*

(Court of Civil Appeals of Texas. Beaumont. July 7, 1923. Rehearing Denied Oct. 10, 1923.)

1. **Mines and minerals ⬿78(1)—Drilling of unproductive oil well held the "completion of a well" within provision of lease.**

The drilling of a well to the depth at which the oil was expected to be found in the vicinity and below which none had theretofore been found, *held* to satisfy provision of oil lease that "completion of a well shall operate as a full liquidation of all rental," though. the well was not producing.

2. **Evidence ⬿518—Expert testimony admissible to explain ambiguity in contract.**

Oil and gas lease providing that completion of a well should be liquidation of rentals was ambiguous, and the testimony of experts in matters of the kind was admissible to explain when well was deemed completed.

3. **Mines and minerals ⬿78(1)—Lessee under implied obligation to fully develop with reasonable diligence where lease does not specify number of wells to be drilled.**

When a lessee undertakes to develop oil or gas land on a royalty or rental basis, and the contract does not specify the number of wells to be drilled, there is an implied obligation that he will fully develop the land with reasonable diligence, and a failure to do so amounts to an abandonment of the lease.

4. **Mines and minerals ⬿78(1)—Completion of one unproductive well did not release lessor from obligation to pay rentals or continue development.**

Where oil lease provided that lessee could keep the lease in effect for five years by paying a specified rental, and that completion of a well should operate as a full liquidation of all rental, the completion of one unproductive well did not give the lessee the right to hold the lease for the full five-year period, but there was an implied obligation to exercise reasonable diligence to develop the land, or make further payments of rentals.

5. **Mines and minerals ⬿77—Abandonment by lessee a question of fact to be determined by acts and intentions of parties.**

Abandonment of an oil lease is a question of fact to be determined by the acts and intentions of the parties.

6. **Mines and minerals ⬿77—Intention to abandon and actual relinquishment essential to "abandonment of lease."**

To constitute abandonment by the lessee of an oil and gas lease, there must be both an intention to abandon and an actual relinquishment of the enterprise, the discontinuance of operation and removal of machinery from the ground being in itself insufficient.

7. **Mines and minerals ⬿77—Evidence held insufficient to prove abandonment by lessee of oil lease.**

Evidence *held* insufficient to prove abandonment of oil lease.

Appeal from District Court, Navarro County; Hawkins Scarborough, Judge.

Suit by Mrs. G. M. Ellis and others against R. S. Chapman and others. Judgment for plaintiffs, and defendants appeal. Reversed and remanded. .

W. H. Graham, of Dallas, for appellants.
J. S. Simkins and S. M. Kerr, both of Corsicana, for appellees.

O'QUINN, J. This suit was brought March 4, 1922, by appellees against appellants to cancel an oil and gas lease. Plaintiffs pleaded forfeiture and abandonment. Defendants denied that either existed. The case was tried before the court without a jury and judgment rendered in favor of plaintiffs, hence this appeal.

The lease contract in question was executed by Mrs. G. M. Ellis to A. R. Lewis on February 15, 1919, who assigned same to R. S. Chapman. The portions of said lease material to a determination of the questions here presented are:

(1) "That we, Mrs. G. M. Ellis and T. E. Lewis of Navarro County, Tex., the parties of the first part, in consideration of the sum of one cent per acre paid by A. R. Lewis, party of the second part, the receipt of which is hereby acknowledged. and the further consideration hereinafter mentioned, have granted, bargained, sold, and conveyed, and do by these presents grant, bargain, sell, and convey unto the said party of the second part, his heirs and assigns, all of the oil, gas, and coal and other minerals in and under the following described land, together with the right of ingress and egress at all times, for the purpose of drilling, mining, and operating for mineral and to conduct all operations and lay all pipe necessary for the production, mining and transportation of all oil, gas, water, coal, and other minerals, with the right to use sufficient water, gas, or oil to operate said property, and shall have the right to remove all machinery, fixtures, and improvements placed thereon at (any) time, reserving, however, to the parties of the first part the equal one-eighth (⅛) of all oil produced and saved upon said premises to be delivered in the pipe line to the credit of the parties of the first part free of charge."

(2) "To have and to hold the above-described premises, unto the said party of the second part, his heirs and assigns, on the following conditions: In case operations for the either drilling of a well for oil, gas, or mining other minerals, is not commenced and prosecuted with due diligence within six months (6) from this date, then this grant shall immediately become null and void as to both parties; provided that second party may prevent such forfeiture from year to year by paying the first party the sum of $1 per acre per year until such is commenced, or until shipments from such mines have begun, and it is agreed that completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term of this lease, which payments can be made the Corsicana

National Bank of Corsicana, Tex., or payable direct to the parties of the first part."

(3) "This grant is not intended as a mere franchise, but intended as a conveyance of the property above described for the purpose herein mentioned, and it is so understood by both parties to this agreement. It is further agreed and understood that the lease on the above-described land is to remain in full force and effect for a period of five years, by paying the rental of $1 per acre per year."

The lease was dated February 15, 1919, and the record discloses that no well was commenced within six months from that date, as required by the terms of the lease, but August 15, 1919, at the expiration of the six months, rent was paid for a year, as provided in the lease, and at the expiration of that year, August 15, 1920, no drilling having been begun, rent was again paid for another year, or until August 15, 1921. About November, 1920, drilling was commenced, which continued up to about January 1, 1921, at which time the well was down to 820 feet, and no oil was found, but the well was filled with salt water and work on same ceased, and the well considered a dry hole. Later, in the latter part of February or the 1st of March, 1921, the casing was pulled, the well filled with mud to prevent caving, and in March the machinery moved to another oil field some four or five miles away, but the derrick was left standing, which was some time later blown down. The well was in what was known as the "Angus field," in which oil sand was usually found at about 680 to 800 feet. No further drilling was begun by the expiration of the third year, August 15, 1921, and Mrs. Ellis demanded payment of another year's rent, which was declined, appellant Chapman contending that having completed a well, within the meaning of the contract, he was relieved from further payment of rentals, the completed well being in full liquidation of all claims for rent. Mrs. Ellis did not agree to this contention, and insisted that she was entitled to rent, or that the contract was forfeited. No more rent was paid, so this suit was filed March 4, 1922. Appellant Chapman offered evidence that he intended to drill the well deeper, but was prevented from so doing by the claim of Mrs. Ellis that the lease was forfeited and by the filing of this suit, and that he had not abandoned the lease or his effort to develop same.

Appellants' fourth and first assignments of error will be considered together, as they raise practically the same question. The fourth assignment asserts that the court erred in holding that appellants did not complete a well on the land involved within the meaning of that term as used in the lease, insisting that the undisputed evidence showed that they did complete a well. The first assignment complains that the court erred in rendering judgment for appellees on the ground of abandonment for nonpayment of rent, for the reason that the uncontradicted evidence shows that at a time when all rentals had been paid the appellant Chapman caused a well to be drilled on the lands leased to the depth of the then known oil sands in that vicinity, and completed said well within the meaning of that term as embraced in said lease, which completed well was a full liquidation of all rentals provided for in the lease for the remainder of said five-year period.

[1, 2] If the well drilled by appellant was a "completed" well, within the meaning of the contract, then the assignments should be sustained. Appellants contend that any completed well, producing or nonproducing, met the provision of the contract; while appellees contend that a completed well is a producing well, and that such well was intended. The lease provided:

"In case operations for either drilling of a well for oil, gas, or mining other minerals, is not commenced and prosecuted with due diligence within six months (6) from this date, then this grant shall immediately become null and void as to both parties; provided that said second party may prevent such forfeiture from year to year by paying the first party the sum of $1 per acre per year until such is commenced, or until shipments from such mines have begun, and it is agreed that completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term of this lease. * * *"

The right to explore for oil or gas was for a period of five years. The contract does not define a "completed" well, and, to that extent, is ambiguous, and where ambiguity in the terms of a contract exists, the testimony of experts in matters of the kind called for in the contract is admissible to explain the ambiguity. The witnesses York and Calhoun, both experienced oil men and drillers, testified that a well was "completed" when it had been drilled to such depth as oil sand was expected to be found in the vicinity where the hole was being drilled, and that in the Angus field, where the well in question was located, oil sand was found from 680 to around 800 feet. We think the well must be classed as a completed well, unless its being a dry hole would prevent it from being so classed. Frost v. Martin (Tex. Civ. App.) 203 S. W. 72; Hall v. McClesky (Tex. Civ. App.) 228 S. W. 1006; Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W. Va. 583, 42 S. E. 655, 658–660, 59 L. R. A. 566. This identical question was before the Supreme Court of West Virginia in the case of Parish Fork Oil Company v. Bridgewater Gas Company, supra, and it was there held, in a lengthy and well-considered opinion, that the completion of any well, dry or productive, was a compliance with the terms of the contract as to the payment of rents, and operated as a liquidation of all rents under the contract.

In the case of Frost v. Martin, supra, Judge Buck, in passing upon this question, says:

"We think that in the sense the word 'completed' is used in this contract it means finished, or sunk to the depth necessary to find oil or gas in paying quantities, or to such a depth as in the absence of such oil or gas would reasonably preclude the probability of finding oil or gas at a further depth. It should not be construed to mean that the lessee bound himself, under the penalty of a forfeiture, to sink a well for oil or gas in paying quantities, or, in the absence of oil or gas, to bore through to China. It therefore became a material question as to whether the hole drilled to the depth of 2,103 feet was a 'completed' well, as that word was used and understood by the parties."

That case was reversed, because the court refused to permit expert testimony to explain the sense in which such technical terms were used by persons engaged in the business of drilling for oil and gas.

In the case of Hall v. McClesky, supra, where the identical question was again before him for consideration, Judge Buck reannounces the definition of a "completed well" given in Frost v. Martin, and holds:

That "a completed well means finished or sunk to the depth necessary to find the oil, or to such a depth as, in the absence of oil, precludes the probability of finding it at a further depth."

The evidence in the instant case showing that the well was drilled to the depth at which oil was expected to be found in that vicinity and below which none had theretofore been found, under the above authorities, the well must be considered as a "completed" well, and, therefore, under the contract, liquidated the payment of all further rentals, and hence the lease could not be held to be forfeited for nonpayment of further rents.

But appellees earnestly insist that the lease was forfeited, because of appellants not paying the rental demanded by Mrs. Ellis August 15, 1921, and call the court's attention to the fact that they alleged in their petition:

"That said lease further provided that notwithstanding a well should be drilled thereon and no oil, gas or other minerals in paying quantities therein found, that this would not have the effect to continue said lease, but that said lease could only be continued by the payment of an annual rental of $1 per acre per year."

The record contains what purports to be a full and complete copy of the lease, and we do not find any such clause in it. The lease contains two clauses relative to the payment of rentals, one in the habendum clause, which reads:

"In case operations for the either drilling of a well for oil, gas, or other minerals, is not commenced and prosecuted with due diligence within six months (6) from this date, then this grant shall immediately become null and void as to both parties; provided that said second party may prevent such forfeiture from year to year by paying the first party the sum of $1 per acre per year until such is commenced, or until shipments from such mines have begun, and it is agreed that the completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term of the lease."

And in next to the last clause of the lease, this language is found:

"It is further agreed and understood that the lease on the above-described land is to remain in full force and effect for a period of five years, by paying the rental of $1 per acre per year."

Appellees insist upon a literal interpretation of said last clause, in their brief using the following language:

"The lease in question specifically and affirmatively providing in next to the last and closing paragraph thereof that the lease on the above-described land should remain in force and effect for the stipulated period of five years only by paying the rental of $1 per acre, said stipulation became and was a controlling provision and requirement of said contract."

We do not think that the repetition of the rental clause last shown adds anything to or subtracts anything from the first one, and was but a mere repetition. If it is contended that the last provision for the payment of rent was intended by the parties to insure the payment of the rent unless a producing well was developed, then why did not they say so? It was a matter of importance to each of them. Why should the court read into the lease something that the parties did not put in? If a producing well was in the contemplation of the parties when they inserted this last clause, they did a vain and useless thing, for no court would construe the contract so as to compel the lessee to give the lessor his royalty and rental too. According to the contention of appellees, the only way a forfeiture could be avoided was by paying an annual rental, regardless of whether a well of any kind, wet or dry, was developed. It seems to us, as was said in Parish Fork Oil Co. v. Bridgewater Gas Co., supra,

"In order to find any reason or purpose on the part of these parties for inserting it, it must be held to apply to a nonproducing well as well as a productive well, and thus end the obligation to pay rent in either event."

Appellants' third assignment of error is:

"The court erred in rendering judgment in favor of plaintiffs and against these defendants, for the reason that the lease involved in this suit conveyed the title to oil and other minerals, and was not a mere leasehold right, and the provision in said lease that the completion of a well should operate as a full liquidation of all rentals for the remainder of the term was a condition subsequent; and said lease is so explicit as to preclude implied conditions and ob-

ligation to continue drilling was merely a covenant, the breach of which would not forfeit the grant, but merely gave the grantors the right to sue for damages, and the uncontradicted evidence in this case showing that the defendant Chapman completed a well within the meaning of said lease, these defendants are entitled to hold said lease without further development or payment of rentals until the end of the five-year period named therein, and the court erred in not so holding."

[3] The assignment is overruled. When a lessee undertakes to develop oil or gas land on a royalty or rental basis, and the contract does not specify the number of wells to be drilled, there is an implied obligation that he will fully develop the land with reasonable diligence, and a failure to do so amounts to an abandonment of the lease. Grubb v. McAfee, 109 Tex. 531, 212 S. W. 464; Munsey v. Marnet Oil & Gas Co. (Tex. Civ. App.) 199 S. W. 689; Jacobs v. Robinson (Tex. Civ. App.) 241 S. W. 243; Aye v. Philadelphia Co., 193 Pa. 451, 44 Atl. 555, 74 Am. St. Rep. 696.

Appellants further complain that the court erred in rendering judgment for appellees canceling the lease in question on the grounds of abandonment, asserting that the undisputed evidence shows that at a time when all rentals had been paid, as required by the terms of said lease, appellant R. S. Chapman caused a well to be drilled on the lands leased to the depth of the then known oil sands in that vicinity, and completed said well within the meaning of that term as embraced in said lease, which completed well was a full liquidation of all rentals provided for in said lease for the remainder of said five-year period, without the payment of further rentals, and that the completion of said well vested in appellants the right to hold said lease for the remainder of the five-year period covered by the lease, without further payment of rentals, and that such right could not be lost by an abandonment.

[4] The assignment is overruled. The contract, we think, clearly falls within the class discussed by Judge Greenwood in Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464. In that case a lease was given for a term of 20 years for the purpose of prospecting, drilling, or operating for oil and gas, for a royalty to the lessor, and was conditioned that the lessee should commence drilling a well within 30 days from the date of the lease and complete same to a depth of 300 feet. The lessee completed such well, producing oil in paying quantities for a short time only, and sunk two other wells without finding oil. He then removed the machinery from the premises, and for nine years conducted no other operations thereon. The lessor sued to cancel the lease, alleging it had been abandoned by the lessee. It was held that the completion of the well required by the lessee did not confer upon the lessee an absolute right to develop oil under the lease at any time in his election within the full term of the lease, 20 years, but that the law implied the obligation from the lessee to exercise reasonable diligence to continue to develop the land for oil after oil was found in the first well, and that the contract was subject to cancellation on the ground of abandonment, and affirmed the judgment canceling the lease on that ground.

[5, 6] But appellees contend that appellants abandoned the lease, and therefore the judgment should be affirmed. Abandonment is a question of fact to be determined by the acts and intentions of the parties. To constitute abandonment by the lessee of an oil or gas lease, there must be both an intention to abandon and an actual relinquishment of the enterprise. The fact that the lessee has ceased to operate, and has removed his machinery from the ground, while tending to show abandonment, is not sufficient alone to constitute abandonment. The length of time, the acts of the parties, and the intention of the lessee must be all considered in arriving at whether in fact abandonment has occurred. In the instant case, the rental was paid up to August 15, 1921. The drilling commenced in November, 1920, and continued until at 820 feet salt water was struck and work stopped, and the casing pulled about January 1, 1921. The machinery was removed to what was called the "Highnote lease," some four or five miles away from the Angus field, about March, 1921. In August, 1921, operations not having been resumed, Mrs. Ellis demanded the payment of another year's rental, which was declined by Chapman, on the ground that, having "completed a well," within the meaning of the contract, he was relieved from the payment of any further rental during the remainder of the five-year lease period. This suit to cancel the lease was filed about March 4, 1922.

Mrs. G. M. Ellis testified:

"I am one of the plaintiffs in this case against Mr. Chapman and others. I called on Mr. Lewis to pay the rent on the 15th of August, and he said he didn't owe any rent. I expected him to pay the rent on the 15th day of August, and when he did not pay it, I called on him to pay it, and he refused. I never did anything to prevent them from developing the property, or drilling the well any deeper; I never thought of anything like that. I thought they had abandoned the well by removing everything off the premises, and when the time came for them to pay rent, why I expected it to be paid, and Mr. Lewis said that the well that they had put down held the lease good. I thought when they abandoned the well, that when the time came for them to pay rent, that they would pay it, and I never said anything to them about it until then."

J. G. Johnson, witness for plaintiffs, testified:

"I am a driller. * * * Mr. Edwin York was the contractor for the well, and I was drilling the well and assisting Mr. York. * * * I guess that I am an expert driller; that's what he had me hired for, to do the work. * * * The well was drilled 820 feet; we found no oil; we found salt water. We did not find any oil sand; we found shale sand. We quit the well at 820 feet, because there was where the oil was supposed to be; that is where the oil was supposed to be in the Angus field. We quit drilling because we ran into salt water; I was hired by Mr. York, and he directed me to stop drilling; at that time Mr. York, Mr. Chapman, and Mr. Lewis were there on the ground. * * * They said 'Pull the casing and leave it go,' so I pulled the casing and left it on the ground there. * * * I know something about the removal of the machinery and rig from the well; it was moved up to the Highnote lease, and we used the casing in a well there. The rig was moved before the casing."

On cross-examination he testified:

"The rig was moved off that lease and the derrick left standing. * * * We did not strike any oil sand at all; a sandy shale is what we found. Sometimes oil is found in shale. There is no sand in the Angus field at 800 feet, but there have been wells drilled in that field that found oil at even lesser depths. We thought we would find the oil around 800 feet, and we did not start in to drilling with the intention of going any further, and the reason I did not is because, as an experienced oil man, I understood that would be all that it was necessary to go to get the oil, if it was to be found."

T. E. Lewis, witness for plaintiff, testified:

"I am one of the parties to this suit. * * * The rig was moved from that place to the Highnote lease, and the casing removed afterwards. * * * The wind blew the derrick down, and they sent over and wanted to move it. They did not remove it because they owed me at that time $42.80, and I would not let them move the derrick on account of them owing me money. I told Mr. Green and Otis Nash, who came to move the derrick, that they were going to pay me before I let them have the derrick."

Edwin York, witness for appellants, testified:

"I am 42 years of age. I reside at Corsicana. I am a contract driller, with rotary rig, drilling for oil and gas. I have had about five years experience in Texas, and ten years in California, before I came here. I have drilled in numerous places in the Corsicana field. * * * I know where Mrs. Ellis' land is south of Corsicana, and I drilled a well on that land for Mr. Chapman; I drilled that well approximately 820 feet deep. That well is in the Angus field; about nine miles south of Corsicana. Before drilling that well I had knowledge of where the oil sand was supposed to be, at what depth, in that field. * * * I learned from various sources, from people who had drilled in that field, at what depth we would probably pick up the sand, at from 680 feet to around 800 feet. I made a contract with Mr. Chapman to drill a well on this Ellis lease. * * * I drilled that well 820 feet deep. * * * When we were drilling we had several nice showings of oil, and we drilled until we thought it would be dangerous to go any deeper; then we proceeded to bale the well and it took two or three days to bale the well and wash it out, and after we baled the well in good shape we went there one morning and found considerable oil in the well, and I thought sure it was a well, and I telegraphed Mr. Chapman that I thought I had him a three or four barrel well. There was not three or four barrels of oil in the well, but there was a fine showing. * * * In four or five days after we had baled the well the last time, we went back and started to bale the well again, and we found that salt water had seeped into the hole and we did considerable baling, thinking it might be a leak in the casing, and then found absolutely that it was a salt water well, and that it came from the bottom. * * * That well was completed when we found the Angus sand, and there was no necessity of going any further. * * * In my opinion, as an experienced driller and oil man, that well on the Ellis land was a completed well, because I went down and found the Angus sand, and I was drilling to get to the Angus sand, and found it at approximately where I expected to find it, and the well was completed. * * * I telegraphed Mr. Chapman the condition of the well, and he came here, and we discussed the situation, and I told him I believed we could get a well by going deeper, pick up another sand at 1,500 or 1,600 feet, and Mr. Chapman then wanted me to pull the casing out of the well, and he would go back home and see about making arrangements to drill the well deeper. It was necessary to pull the casing, because I drilled a 9-inch hole and set 6-inch casing, and it would be impossible to make that hole any greater depth with a rotary rig, for the reason that I could only use 5¼ or 5½ inch casing inside the 6-inch casing, and my drill stem almost filled up this casing, and there would hardly be any clearance between the 5¼ or 5½ inch casing and the 6-inch casing, and it would be impossible to carry it to any much greater depth because I could not make but a few feet a day. I had negotiations with Mr. Chapman in reference to drilling that well to a depth of 1,500 or 1,600 feet, but in the meantime I had contracted to drill some wells on the Highnote lease with Mr. Edgar Gray, which is about four or five miles from the Ellis lease, almost due north, or a little east of north. I found production in the wells on the Highnote lease at 1,400 feet. After drilling on the Highnote lease, I did not go back and drill any more on the Chapman lease, because the lease was involved in a controversy then, and they were trying to take it away from Mr. Chapman. Mr. T. E. Lewis came to my office in the Commercial Hotel, and said he wanted to lease the Chapman lease for $50 an acre, and I asked him why, how could he do that, and he said they had taken the lease away from Mr. Chapman, and I immediately asked Mr. A. R. Lewis about it, and he said, 'No, there was a controversy about it.' I afterwards discussed with Mr. Chapman about the controversy, and he told me that was the reason he could not go on with the well. When I left the Chapman lease, after

finishing work there for Mr. Chapman, I took the machinery, the rig, with me; I did not take the derrick. I pumped the hole full of heavy mud to block the well in order to come back and drill it deeper to 1,400 or 1,500 feet as soon as I completed the work on the Highnote lease, and just left the derrick standing there. I know that the derrick was standing there several months, and I had occasion to go down there and see Mr. T. E. Lewis, the son of Mrs. Ellis, and he had pulled the stobs up from around the derrick, the stakes that the guy wires were fastened to, in order to plow, and he stated that it did not matter to him if it did blow down, and I told him that if he let the derrick blow down, he would be responsible, because Mr. Chapman wanted to drill the well deeper, and that he would be responsible for taking the guy wires down; he said that he pulled the stobs in order to plow, but would put them back again."

On cross-examination he testified:

"That was the first well I had ever drilled in the Angus field, and the only one. I had some personal knowledge of the formation by getting the logs of the other wells there. I had a man working for me, Mr. Buck White, who lives at Angus, and he had drilled 14 or 15 wells in that Angus field. * * * I did not make any written contract to drill that well deeper; it was just understood between ourselves. That was at the same time Mr. Chapman came here. * * * I was to drill the well to a depth of 1,500 or 1,600 feet, and I was going to use the same derrick. * * * The preparations I made to drill that well deeper were these: I pulled the casing, and left my rig stay there for several weeks until I had to move over on the Highnote lease in April, the latter part of March or April. It was in March I moved over to the Highnote place, because I spudded in before the 6th of April. Mrs. Ellis or her son, Mr. Lewis, neither one told me not to drill that well any deeper, or anything of that kind, but they did prevent me from carrying out my contract to drill deeper with Mr. Chapman by filing a law suit against him, so that naturally stopped me. I never made any effort to hold Mr. Chapman on his contract to drill the well deeper; the contract is still in existence today, just an understanding between ourselves. Mr. Chapman was talking to me yesterday, and asked me if I thought we could use that old hole and go 1,500 or 1,600 feet deep, and I told him I had not been down there and examined it, but I did not think we could, because the derrick had blown down, and it was practically impossible to rebuild a derrick again, so that it would be directly over the hole, and we decided that it would be necessary to start a new hole."

A. R. Lewis, witness for appellant, testified:

"I am not related to Mr. Lewis, the son of Mrs. Ellis. I am acquainted with Mr. Chapman, the gentleman who was here in the courtroom yesterday, one of the defendants in this case. I am also one of the defendants in this case. I know Mr. York, who testified in the case. * * * In looking after the drilling of that well I represented Mr. Chapman, at his request. I was there when the derrick was erected and it was made extra strong in case that we might have trouble in getting the drill stem out, or blowing the casing, or any other purpose in drilling. Mr. Chapman suggested to me why he wanted the derrick built with those extra pieces nailed on to it; he said that in case that he did not get a paying well, he might want to go deeper and might need a strong derrick. I think that well was drilled a little better than 800 feet deep. After Mr. York went over to the Highnote lease, Mr. Chapman had me to go several times to see about the well, and to keep in touch with it, and see that the derrick was all right, as he wanted to drill deeper. I know that Mr. Chapman had made arrangements to drill that well to a greater depth. He came here once with $2,000 to sink it to 1,400 foot sand, and when he got here he found that Mrs. Ellis wanted her lease back, and he got on the train and left; he didn't want to put any more money in it if they were going to attempt to get the lease back. Mrs. Ellis and her son both told me that they wanted the lease back, and I told Mr. Chapman about it, after he came here with the $2,000. I told him at that time what they said, that they felt like he had not complied with the contract, and they wanted the lease back. I don't remember at that time of Mrs. Ellis making any complaint about the rentals not having been paid, though I don't know exactly what time that was, her complaint was that they never got a paying well, and she considered that they were through, and she had a chance to sell the lease, and she wanted to get a release so as to clear her title. She wanted to release the land, and I told her I did not have anything to do about releasing it, that was the information I imparted to Mr. Chapman. Mr. Chapman gave me instructions to take care of the derrick on the lease; that he wanted to go deeper, and I looked after it; I was down there several times. The rig stayed on that lease for some length of time after the well was abandoned and work ceased on it. I have been associated with Mr. Chapman in a business way in this lease since I assigned it to him, and I have had frequent conferences with him about it. He mentioned to me about wanting to go deeper, and has had me to go to see Mrs. Ellis several times to see if she would not let it go deeper, and she contended for the lease back every time."

On cross-examination he testified:

"* * * I don't remember what date it was that Mr. Chapman came down here with $2,000 to drill the well deeper; I don't know what month it was, but it was last year. I don't remember whether it was long after the Mexia oil boom or not; he was here several times, and I don't know whether that was the time that there was a good deal of excitement about oil in this vicinity or not. I think Mrs. Ellis did say something to me about the payment of rentals on that lease after the well was abandoned; I think she said she wanted the rentals paid, and I think it was before that time that Mr. Chapman was down here, but I am not right sure about it. That was some time after work had been abandoned on the well."

J. C. Calhoun, witness for appellant, testified:

"I live here at Corsicana. I have had experience in the oil business in the Corsicana field for about 10 years, and am familiar with the Angus field. I have holdings in the Angus field at this time, producing wells. The depth at which oil is found in that Angus field varies somewhat according to the topography; the wells nearer the creek, we find producing sand in them at a shallower depth than we do in the wells upon the hill. One well last spring that I drilled, we got our first production at 675 feet, and we found a second sand at 700 feet, and went 10 feet into it. However, other wells have been drilled as deep as 800 feet, practically offsetting the well that we drilled to 710 feet. * * * The term 'completion of a well' as we use it locally, would mean that you had completed the objective that you had in view when you started out.

"Q. If a man contracted to go a certain depth, when he reached that depth, would you say he had completed his well, whether it was dry or wet? A. Well, that would depend on circumstances; you would have to take into consideration whether he found a paying well or not. Before the coming in of the discovery well at Mexia, why I would consider that a maximum of 1,000 feet depth in the Angus field would be a completed well, but since that time I would want to go down to the woodbine sands if I was drilling a deep test. Production in the Angus field is usually found at from 700 to 800 feet, and if the objective in drilling a well in that field was the Angus sand, why I would say that not over 1,000 feet depth would be a completed test, and the minimum would be about 700 feet."

On cross-examination he testified:

"In the oil fraternity, we would call a dry hole an abandoned well, and one that produced oil is completed well, in the absence of any contract about the matter. A well can remain an uncompleted well for a long period of time, if it has a good showing that would justify you in completing it later on."

[7] The above is practically the evidence in full bearing on the question of abandonment of the lease. It is undisputed that Chapman had an agreement with York, the contractor, to drill the well deeper, and that he, York, after a few months in the Highnote field, stood ready to renew the drilling in the well on the Ellis lease, but that Mrs. Ellis' desired her lease back, so that she could resell it. York testified that T. E. Lewis, son of Mrs. Ellis, and one of the plaintiffs, tried to sell him the lease at $50 an acre, and said that they (he and his mother) had taken the lease away from Chapman. Appellees knew that Chapman was intending to resume drilling in the well, because York testified that he told T. E. Lewis at the time they were talking about the derrick that Chapman wanted to drill the well deeper. Also, A. R. Lewis, one of the defendants, testified that Chapman sent him several times to see Mrs. Ellis to get her to agree that he, Chapman, might go on with the drilling, and that she each time insisted that she wanted the lease back, and that at the time Chapman came there with the $2,000 to renew the drilling, he, Lewis, went to see Mrs. Ellis, and that she insisted that she wanted her lease back. None of this testimony was denied by appellees. We are of the opinion that the evidence fails to sustain the judgment of the court on the issue of abandonment.

For the reasons given, the judgment is reversed, and the cause remanded.