**DUFF v. DU BOSE et al.  (No. 1780.)**

Court of Civil Appeals of Texas.  Beaumont.
March 1, 1929.

Rehearing Denied March 13, 1929.

Kennerly, Williams, Lee, Hill & Sears, of Houston, for appellant.

Wolters, Blanchard, Woodul & Wolters, of Houston, for appellees.

WALKER, J. This suit was instituted by appellees against appellant to cancel a mineral and oil lease executed by them or their privies on April 29, 1919, to him on 50 acres of land, a part of a larger tract of 500 acres owned by them on the Hicks-Shropshire survey in Ft. Bend county. This larger tract had been subdivided into smaller tracts, and the 50 acres in controversy comprised block No. 5, containing 20 acres, block No. 10, containing 20 acres, and the south half of block 21, containing 10 acres. Appellant answered by pleading specially his defenses, setting forth in minutest detail the things done by him and his assigns under the lease, pleading that these acts were sufficient to save the leasehold from forfeiture and to give him a vested interest therein. Simply on the pleadings, without hearing any evidence, the trial court held that the legal effect of the facts pleaded by appellant was to divest him of all rights under the lease and to reinvest appellees with the title thereto, and entered judgment accordingly. The question presented by this appeal is: Did appellant plead himself out of court by confessing facts which entitled appellees to judgment canceling the lease? The following is a brief statement of the facts pleaded by appellant. He thus summarized the conditions of the lease in controversy:

"Said lease provided that the lessors therein, in consideration of the sum of Ten Dollars ($10.00) cash paid by R. C. Duff, lessee, did lease, let and demise the fifty (50) acres above described, and did grant, let and demise the

fifty (50) acres above described, and did grant, transfer and assign to the lessee, subject to the royalties stated, all oil, gas and other minerals on or under, and full rights of ingress and egress to and over, the premises aforesaid, intending to convey to lessee subject to the terms thereof not only all of the oil, gas and sulphur and other minerals under said land, but also to grant to him all rights of ingress and egress held by lessors on and over other tracts theretofore owned or held by lessors or under which lessors own the mineral rights in said Five Hundred (500) acre tract above mentioned.

"Said instrument provided that the said lessors made the said grant to lessee, his heirs and assigns, for the purpose of exploring the same for the producing of oil, gas and other·minerals therefrom and to that end also granted the exclusive right of drilling and operating thereon for oil, gas and other minerals, together with the right-of-way for and the right to lay pipe lines to convey water, oil, gas and coal produced from the leased premises, to drill and operate any wells or mines, and to drill for oil, together with such other privileges as were reasonably requisite for the conduct of said operations, all upon the following conditions:

"That lessee should,· within ninety (90) days from date begin operations for the drilling of a well on said land and conduct same with reasonable diligence in a bona fide attempt to discover oil or gas until such well might be completed or abandoned.

"That in case lessee should fail to comply with the foregoing stipulations in the above paragraph, he should forfeit back to lessors all his rights thereunder.

"That after the completion of said well, lessee should have the right to make as many more attempts to find oil or gas as he should please, provided that such attempts should be successive in the sense that until oil or gas be found not more than sixty (60) days should elapse between the cessation or abandonment of work on one well and the beginning of work on another; and provided further that after the completion or abandonment of the first or any subsequent well, if same should prove unproductive, lessee should have the right at any time within sixty (60) days after the completion or abandonment of such well to pay to lessors stipulated rentals per acre, and in case of such payment or deposit, the time of lessee, his heirs or assigns, in which to begin the drilling of the next well might be extended for a period of six (6) months to run from the date of such payment, and that similarly lessee might from time to time make payments on or before the expiration of each such extension of six (6) months, and thereby extend the time in which to begin another well on said premises, provided the aggregate of such extensions should not .exceed a period of three (3) years to date from

the completion or abandonment of said first well or subsequent wells; and provided further that said Duff, his heirs or assigns, should have the right to pay and retain such extension on the whole or parcels of said land to be designated by him, and any tract or tracts on or with reference to which said Duff, his heirs or assigns, should fail to make payment within the time stipulated should thereby be released and all rights thereunder be forfeited to lessors, their heirs or assigns.

"That if oil or gas be discovered on said land in paying quantities, lessee should have the right to produce same, and such right should remain in effect so long as oil, gas or other minerals 'can be produced from same in paying quantities, and provided lessee shall in such event further develop the said land for the production of oil, gas or other minerals as may be justified under the circumstances. If lessee fails to comply with this provision, this lease shall terminate.'

"(This is one of the most material provisions of the lease.)

"Said lease further provides:

"'At any time after the completion of said well, Lessee shall have the right to surrender this lease, and on such surrender shall be discharged from all obligations hereunder, but upon such surrender lessee shall have the right to retain any producing well or wells, together with the five-acre tract, or tracts, on which any such wells are located, it being agreed that each producing well shall earn and hold five acres, the same to be laid off as nearly in the form of a square with the well in the center, as is possible. Lessee shall have the right to drill as many more wells in such retained tracts as he pleases so long as oil, gas and other minerals can be produced from any such tracts in paying quantities, provided, however, that lessee shall pay a royalty as herein stipulated on the production from any such retained tracts.'

"That if oil be .produced in paying quantities by operations thereunder, lessee should deliver to lessor one-sixth of the oil saved from that produced.

"Royalties were provided as to gas and sulphur and all other minerals.

"That if any well producing oil in paying quantities should be brought in on adjacent property within one hundred (100) feet of the line of any of the tracts covered hereby, lessee should drill such offset well on the tracts above leased as should be necessary to properly protect the interests of the lessors and of the lessee thereunder.

"That failure to do and perform any or all of the conditions set forth in said·instrument rendered same null and void and at the option of lessors.

"That all conditions and terms thereof should`extend to the heirs, executors, legal representatives and assigns of all the parties thereto."

This lease was executed and accepted in settlement of a controversy between appellees and appellant over the validity of the lease held by him under them covering the 500-acre tract, of which this 50 acres is a part. Under this settlement appellant released his claim on 250 acres of the 500-acre tract, and appellees afterwards leased 248 acres of this 250 acres to the Texas Oil Company for about $150,000. Appellees, under this settlement, confirmed appellant's claim to 150 acres of the 500-acre tract, and gave him a new lease on 50 acres, being the lease in controversy. As part of the settlement, a third party, the Blue Ridge Oil & Gas Company, was given a lease on the remaining 50 acres of the 500-acre tract. After the settlement was made, the Texas Company took over appellant's obligations under the 50-acre lease and 150-acre lease, and the obligations of the Blue Ridge Oil & Gas Company under its 50-acre lease, thus holding all the 500 acres, except about two acres reserved by appellees. Afterwards, on the 13th day of June, 1919, the Texas Company entered into a pooling agreement with appellees, appellant, and the Blue Ridge Oil & Gas Company, by which the 500-acre tract was to be developed as one proposition, all the interested parties sharing in the production in proportions satisfactory to them, regardless of where the development was had on the 500-acre tract. The following are the only provisions of this agreement pertinent to this appeal. It provided that all the leases were "combined, merged, pooled, and shall hereafter be considered one lease for the purpose of development and operation by The Texas Company."

It further provided that the Texas Company had the option at any time to surrender the premises to the interested parties jointly, or, if they did not want a joint assignment, then the Texas Company had the privilege of reassigning each of the original leases back to the parties under which it held. Under this pooling agreement, appellees consented and agreed to a suspension of the drilling obligations imposed upon appellant by the terms of his leases on the 150-acre tract and the 50-acre tract in controversy, and agreed that during the life of the pooling agreement the operations by the Texas Company should suspend operations by appellant, but there was nothing in this pooling agreement suspending appellant's obligations under his lease beyond the life of the pooling agreement. The Texas Company operated under this pooling agreement from June 14, 1919, to November 9, 1925, drilling ten wells on the 500 acres at a net loss to it of about three-fourths of a million dollars. Four of the wells, Nos. 1, 2, 7, and 13, were drilled on appellant's 150-acre lease, and two, Nos. 9 and 11, on the 50-acre lease in controversy. Well No. 1 was completed on the 5th day of January, 1921, to a depth of 3,488 feet, but was destroyed by sanding up. However, because of the showing it made, many leases and much development resulted on smaller adjacent tracts at great cost to the operators. None of these wells were producers. Afterwards the Texas Company tried to develop other sections of the 500-acre tract, drilling wells Nos. 2, 3, 7, and 8 at various locations thereon without finding production. About May 1, 1922, it commenced drilling its ninth well on block No. 5, near its southeast corner. This well was completed in 1922 at a depth of 3,892 feet, coming in with small production, but showing unfavorable formation. It was operated under the pooling agreement to March, 1923, when it was abandoned, after producing only 4,274.78 barrels of oil. Well No. 10 was then drilled on the 248-acre tract leased direct from appellees, and about January 12, 1923, was completed at a depth of 3,900 feet, with an initial production of 3,000 barrels daily, and has continued a good producer. Well No. 11 was completed to a depth of 4,805 feet without discovering oil, and was abandoned about May 20, 1924. Afterwards the Texas Company completed another well near well No. 10, which came in as a small producer, but lasted only a few weeks. Afterwards the Texas Company began drilling well No. 13, on appellant's 150-acre lease, but abandoned it about the 13th of October, 1925, as a dry hole at a depth of 4,592 feet. On the 9th day of November, 1925, the Texas Company notified all interested parties that under the terms of the pooling agreement it was withdrawing therefrom, and would operate no longer thereunder, and was ready to reassign to all interested parties the leaseholds held by it under them, except under the pooling agreement it was reserving well No. 10, with 10 acres surrounding. Afterwards, on the 3d of December, 1925, though the contract was dated the 14th of November, 1925, the Texas Company reconveyed to appellant the leaseholds on the 150-acre tract and on the 50-acre tract held by it under him. Afterwards appellant made many unsuccessful efforts to interest oil companies and oil operators in a further development of the 50 acres. About August 1, 1926, appellees made a lease on the 500 acres to Navarro Oil Company. About August 13, 1926, they requested appellant to reconvey to them his claim on this 50 acres, which he refused to do, on the following grounds, as pleaded by him:

"That defendant's lease was still good, and that he proposed to hold same, that further drilling on any part of the premises covered by said fifty (50) acre lease under existing circumstances was not justified, but that if the Navarro Oil Company found a new sand or succeeded in completing a good producing, profitable well on its location near the South boundary line of said Block No. 5, defendant

would feel that same would constitute circumstances justifying his drilling of an offset well on the South part of Block No. 5, and that he would be willing to do so. Plaintiff Robinson insisted that defendant give up defendant's lease and execute a release thereof, stating that if defendant persisted in his refusal to do so, plaintiffs would file suit against defendant to cancel said fifty (50) acre lease. Defendant protested against such proposed action and insisted upon his right to hold Block No. 5 and the balance of the premises covered by his fifty (50) acre lease until some new development occurred that sufficed to overcome the lessons taught by the disastrous experience of The Texas Company and of the various other companies that had drilled in that district."

Appellant pleaded no act under the lease, except the operation by the Texas Company under the pooling agreement. He admitted that it was not his intention to develop further the 50 acres, unless development by other parties of adjacent land should show with reasonable certainty that oil in paying quantities would be discovered on his 50 acres. It is not controverted, but confessed by appellees, that the operations of the Texas Company under the pooling agreement were sufficient to protect appellant's rights under this lease during the life of the pooling agreement.

Appellant advances the following propositions against the judgment:.

(1) The discovery of oil by the Texas Company by drilling well No. 9 on the land in controversy was in satisfaction of the drilling obligations imposed upon him by the terms of this lease.

(2) The obligations of the defendant under his lease did not revert to him until the 3d day of December, 1925, the date the reassignment was, in fact, executed.

(3) Oil having been found by the Texas Company by drilling well No. 9 on this 50 acres, appellant was entitled to the benefit thereof in measuring his obligation to appellees, which was to do only "such further drilling as under the circumstances might be justified," and on the facts pleaded he was excused from making any further development until operations on adjacent lands should show with reasonable certainty that oil in paying quantities would be discovered on his 50 acres. He pleaded that his offer on such conditions to have the land developed was a compliance with his drilling obligations.

(4) The facts pleaded raise an issue of fact for a jury as to whether under the circumstances further operations were justified, and the facts pleaded did not, in law, as the trial court held, amount to a forfeiture of his rights under the lease.

(5) "The provision of said lease requiring the defendant, after oil might be obtained in paying quantities, to do such further drilling as the circumstances might justify was too indefinite to be the basis for a forfeiture by the court, especially when read in connection with the other provision of said lease to the effect that a violation of all or any of the terms in said lease should give the lessors the option to cancel, and the most that the lessors were entitled to do was to make a demand upon the defendant that he drill a well after the re-acquisition of his lease from The Texas Company, and give him a reasonable time within which to do that, and plaintiffs failing both to make such demand for the drilling of such well and to give defendant a reasonable time to do it have precluded themselves from claiming a forfeiture or termination of the lease."

## Opinion.

From the facts pleaded by appellant and his propositions thereon, it is manifest that he relies solely upon the operations of the Texas Company under the pooling agreement to save a forfeiture of the leasehold in question. We think the only effect of the pooling agreement was to toll the time when the drilling and other obligations assumed by appellant under this lease would become effective against him. During the time the Texas Company was operating on the 500-acre tract as a unit proposition, it was operating under the conditions of the pooling agreement, and during that time, by the express conditions of that agreement, appellant's obligations were suspended. However, there was nothing in that agreement substituting the operations by the Texas Company for the personal obligations assumed by appellant, but only suspending his obligations. From the execution and delivery to appellant of his lease, nothing was ever done thereunder by him or any one else for him to satisfy its obligations. While the pooling agreement was in force, appellant's rights under this lease were protected, for, as we have said, by its express terms it tolled during its life appellant's obligations to appellees, but, when the pooling agreement was terminated, the obligations against appellant were ipso facto revived, and, since he admitted that he had done nothing to discharge the burdens of the lease, the law declared a forfeiture against him. On the construction we give the facts and the law applicable thereto, appellant's propositions are necessarily denied. The judgment of the trial court is therefore affirmed.