63 So.2d 417

ESSO STANDARD OIL CO. v.
NESBITT et al.

No. 40630.

Jan. 12, 1953.

Rehearing Denied Feb. 16, 1953.

Ashton L. Stewart, Baton Rouge, and Hargrove, Guyton, Van Hook & Hargrove, Shreveport, for defendant-appellant.

John M. Madison, Wilkinson, Lewis & Wilkinson, Charles H. Blish, Shreveport, for defendants-appellees.

McCALEB, Justice.

This is an interpleader suit involving the construction and effect of a certain provision contained in a written assignment of a mineral lease. The undisputed facts disclose that, on May 27, 1940, G. G. Nesbitt, Jr., the sublessee of an oil, gas and mineral lease executed on November 16, 1936 by Edward Dupuis in favor of one George P. Reid, covering certain land situated in the Anse LaButte Oil Field in St. Martin Parish, conveyed his interest, insofar as it affected 3.75 acres of the land, to The Hunter Company, Inc. and Rice Drilling Company in proportions of an undivided one-half in-

terest to each.[1] The consideration for the transfer was the sum of $2,000 cash and, in addition, Nesbitt retained an overriding royalty reading as follows:

"(b) Assignor reserves unto himself, his heirs, successors and assigns, three-sixteenths (3/16) of the oil, gas or other minerals which may be produced from the leased premises herewith assigned, and Assignees hereby agree to deliver to Assignor into the pipe line to which Assignees' well, or wells, may be connected, said three-sixteenths (3/16) of the oil, gas or other minerals which may be produced from said leased premises, free of any cost whatsoever to Assignor into the pipe line to which Assignor shall be required to pay the severance tax, or other taxes, directly assessed against said oil, gas or other minerals, or the severance thereof. It is further provided, however, and agreed between the parties that said reservation of three-sixteenths (3/16) of the oil, gas or other minerals produced from the leased premises, which reservation is in the nature of an overriding royalty interest, shall only be effective during such period, or periods, *as to each well completed on the leased premises* during which *such well* produces an average of 100 barrels of oil per day, during each monthly period for which accounting is made by the pipe line company purchasing the oil produced from the above described premises, said average, however, shall be determined by actual production during such monthly periods and not by pipe line runs or sales of oil. During any period, or periods, where the average production from *any well located on the leased premises* is below 100 barrels per day for the monthly period in question, the overriding royalty interest reserved by Assignor, as hereinabove set forth as to the production *from such well,* shall be reduced from three-sixteenths (3/16) to one-eighth (1/8) of the oil, gas or other minerals produced from *such well.* Such reduction in said overriding royalty interest, however, shall be effective only from month to month during the period, or periods, as to *each well* completed on the leased premises when *such well* is not productive of an average of 100 barrels per day for the monthly period in question". (Italics ours.)

Following their acquisition of the lease, assignees made successful explorations on the property, completing several oil wells. On February 16, 1950, almost ten years after their purchase, they obtained a permit

---

1. The contract is styled as an assignment but, under the established jurisprudence, it is a sublease inasmuch as Nesbitt retained a 3/16 overriding royalty. See Bond v. Midstates Oil Corp., 219 La. 415, 53 So.2d 149 and Baker v. Potter, 223 La. —, 65 So.2d 598.

from the Department of Conservation to drill Well No. 5 to 6,000 feet or to the "Lower Martin B. Sand". This well was completed at a depth of approximately 5,600 feet and thereafter, on April 25, 1950, they were granted an additional permit to dually complete a well designated as No. 5D at the "Upper Martin B. Sand" or at a depth of 5,470 feet. The production from the Lower Martin Sand was obtained through the tubing in the well and the oil from the upper sand was withdrawn from the annular space between the tubing and the casing of the well, the two sands being shut off from each other by means of a packer installed between the tubing and the casing. The allowable production from each sand was less than 100 barrels daily but the combined production was well over that amount.

Contending that the withdrawal of the oil from the different sands constituted production from two separate wells, recognized as such by the Department of Conservation, assignees made claim on Esso Standard Oil Company, the vendee of the oil, for an increase of ⅟₁₆ in their share of the proceeds, citing the contract provision which reduces the overriding royalty of Nesbitt to ⅛ whenever production from a single well does not average 100 barrels per day during the monthly period designated for an accounting by the pipeline company.

Nesbitt, on the other hand, took the position that there was but one oil well from which production exceeded 100 barrels per day and that the circumstance that the oil was being withdrawn from separate horizons was of no consequence.

With affairs in this state, Esso Standard Oil Company filed the instant suit, as authorized by LSA–R.S. 13:4811–4817, depositing in the registry of the court $3,287.45, representing the value of ⅟₁₆ of the oil withdrawn from the two sands, after deduction of severance taxes, for the period from June 1st through October 31, 1950 and called upon the adverse claimants to assert their rights.

Following a hearing in the trial court on the issue in controversy, there was judgment in favor of the assignees. Nesbitt has appealed.

It will be seen from the foregoing that the case tenders for decision the question of whether, under the above quoted provision of the assignment, oil secured from a single hole in the ground, but emanating from different sands or horizons, constitutes production from more than one oil well, it being conceded by the parties that, at the time the contract was confected, dual completions were unknown to them and that this method of recovery was not officially recognized in Louisiana until some time in 1942. Since the contract is the law between the parties, Articles 1901 and 1945 of the LSA–Civil Code, the issue is simply one of construction as the courts are bound to give legal effect to all contracts " * * * according to the true intent of all the parties * * *", the intent to be determined by the words of the contract " * * * when

these are clear and explicit and lead to no absurd consequences * * *". Article 1945, LSA–Civil Code.

Inasmuch as the parties were uninformed as to dual completions at the time they contracted, it is obvious that this method of recovery was not within their contemplation. Hence, it is to be presumed that, when they spoke of an oil well, they used the term in its common and usual signification. Article 1946 of the LSA–Civil Code. A well is generally understood to be "A shaft or hole sunk to obtain oil, brine, gas, etc. * * *" Webster's New International Dictionary, 2nd Ed. 1950, and, as applied to oil, has been defined by this court to be a hole " * * * to be drilled into the earth with the hope that it may become a well through which oil and gas may be produced * * *". Knight Bros. v. Standard Oil Co., 147 La. 272, 84 So. 653, 654.

Counsel for assignees, however, proclaim that the term "oil well" is a technical phrase and, therefore, is to be interpreted, under Article 1947 of the LSA–Civil Code, according to the meaning given it by those "who profess the art or profession" to which it belongs. From this premise, it is said that, since the Department of Conservation considers dual completions from one well as distinct wells and fixes an allowable production for each horizon, the trial judge properly construed the language of the contract as effecting a reduction in the royalty to which assignor was entitled.

We are not impressed with these postulations. Initially, we do not regard the term "oil well" to be a technical phrase. But, if it be conceded that the parties, being well versed in the oil business, contemplated that the term was to be interpreted in the same manner as it was understood by those engaged in that profession, it does not help the plea of assignees—for, admittedly, the parties knew nothing of dual completions and, therefore, could not have intended that production from each sand would be considered as a separate oil well. Had the parties foreseen such a consequence, it could have been expressed in succinct language. In the absence of precise terms or, even in case of doubt, the agreement "is interpreted against him who has contracted the obligation". Article 1957 of the LSA–Civil Code.

Another argument of counsel is that, since Nesbitt is receiving the same overriding royalty that he would have received if two separate wells had been drilled for the purpose of withdrawing the oil from each sand, he is not in a position to complain merely because the dual completion accomplishes the same result.

This, in truth, is a plea allegedly founded on equity. But there is no room for the application of equity here; the parties have made their contract; that is the law of the case and the court is bound to give it legal effect according to the true intent of the parties at the time of its confection.

This rule of law also exposes the invalidity of another contention of assignees.

that the parties are to be bound by the subsequent recognition given by the Department of Conservation to dual completions. Aside from anything else, to retrospectively apply the orders of the Department of Conservation to this agreement would be violative of the first rule of contractual interpretation set forth in Article 1945 of the LSA–Civil Code "That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made".

It was suggested by counsel for assignee during oral argument that, since the parties did not envision the advent of dual completions, there was no common intent between them.

We fail to perceive any substance in this notion. Indeed, it is proper to assume that the parties understood the term "oil well" in its general and popular sense. But, were it otherwise, it is difficult to discern how a holding that there was no common intent would aid the cause of assignees—for, without consent there would be no agreement, Article 1766 of the LSA–Civil Code, or, as stated in the fourth paragraph of Article 1945, " * * * if there was a difference in this intent, there was no common consent and, consequently, no contract". If there was no contract, assignees are not entitled to any part of the production.

· The judgment appealed from is reversed and it is now ordered that there be judgment herein in favor of G. G. Nesbitt, Jr., decreeing him to be the owner of the sum

of $3,287.45, deposited in the registry of the Nineteenth Judicial District Court by Esso Standard Oil Company and the Clerk of that Court is directed to forthwith pay over that fund to him. It is further ordered that the claims of Rice Drilling Company and The Hunter Company, Inc. be dismissed and those claimants are to pay all costs of this proceeding.