**STRUSS et ux. v. STODDARD et al.**

No. 15423.

Court of Civil Appeals of Texas.
Fort Worth.

May 8, 1953.

Rehearing Denied June 5, 1953.

Miller & Rutta, of Columbus, and Cleaves & Cleaves, of Houston, for appellants.

Royston & Rayzor, of Houston, J. F. Orr, of Fort Worth, R. M. Coleman and Ben G. Smith, of Fort Worth, Thompson, Knight, Wright, Weisberg & Simmons, of Dallas, C. M. Gaines, of San Antonio, Cecil C. Cammack, of Fort Worth, and Massey, Hodges, Moore & Gates, of Columbus, for appellees.

MASSEY, Chief Justice.

Appeal from District Court of Colorado County, Texas.

Appellants brought suit in trespass to try title as to 353.16/908.39 oil and gas royalty interest in and to four tracts of land in Colorado County, Texas, the total acreage of said tracts amounting to 555.23 acres. Appellees were the owners of the remaining oil and gas royalty interests under said total acreage, under allegations of the suit brought by the appellants, and under their contentions they owned all of the oil, gas, mineral and royalty interests thereunder. Upon their motion for summary judgment, judgment was rendered in behalf of the appellees, and it is from this judgment this appeal is brought.

For purposes of this opinion, reference to appellants herein shall mean the parties in that category and status in relation to the questions posed on this appeal as they existed on date of February 22, 1945, the date on which there was filed of record and effective an instrument hereinafter referred to as the unitization contract or agreement of 1944, and shall also mean and include their successors in title and interests in title. Reference to appellees herein shall mean the parties in that category and status in relation to the questions posed on this appeal as they existed at the same time, and shall also mean and include their successors in title and interests in title.

On said date, early in 1945, the 1944 unitization agreement became effective. This agreement included interests under two parcels of land belonging to appellants, constituting one tract totalling 330.7 acres of land. This tract was already under lease as to oil and gas mineral interests for a primary term of ten years from January 15, 1941. Said tract will be hereinafter termed appellants' large tract. The unitization agreement also included what will be hereinafter called appellants' small tract, a tract containing 22.46 acres of land, under lease by appellants as of March 17, 1943, as to oil and gas mineral interests for a primary term of ten years. Both tracts were under leases which were conditioned that in the event the lessees thereunder should, from dates of their execution, not have commenced drilling operations thereon within one year's time, the leases should terminate as to both parties, unless by payment of prescribed delay rentals the lessees could extend the period from year to year without commencing drilling operations.

By the terms of the lease of the appellants' large tract, if prior to expiration of the first year drilling operations should have been instituted, the lessee owed no duty to pay such rentals except, if as result of such drilling operations (no rental money being paid) a "dry hole" was proven, in which event the lease was to still be effective if the lessee paid or tendered to the lessor these rentals prescribed to become due after expiration of three (3) months following the date of completion of the "dry hole," in which event the lease continued in effect for its primary term without any further drilling activity, so long as the delay rentals entitling the lessee to delay drilling of any kind further were paid as provided by the lease. Provisions in the lease covering appellants' small tract were similar though not identical. After the "dry hole" was drilled, rentals were accepted by appellants from their lessees on each of the leases as to said tracts. Both leases were of the "unless" type, wherein lease expiration was provided to occur without further affirmative action.

There were four other tracts of land, belonging to other lessors, under oil and gas leases at time of the unitization agreement of 1944, but the leases as to all of these tracts, except one which was for a primary term of five years, expiring January 15, 1946, were for ten years, and none

of them expired until 1951 or later, and subsequent to events giving rise to this cause of action. In this unitization contract, the acreage total involved as to appellants was 353.16, and the acreage total, involved as to the other lessors, appellees herein, was 555.23, and together appellants' and lessor appellees' acreage totalled 908.39 acres.

By the unitization agreement of 1944, appellants and lessor appellees and lessee appellees contracted together for a pooling of all the acreage and interests thereunder for oil and gas purposes, conditioned as will be hereinafter described. By the terms of this contract the royalty owners would share proportionately in royalty interests, as to any and all oil produced from any part of the acreage involved, as their respective proportionate interest under any of the several tracts related to total acreage of all parcels. In other words, as to any and all oil produced anywhere upon and from under the 908.39 acres the appellants would be entitled to 353.16/908.39 fractional royalty interest in the oil produced. It was provided that the several leases (for the purposes of the unitization agreement) would be treated as an entirety, as though all the land was under one lease from one person, and the various leases were incorporated by reference in the unitization agreement for description of the leases as well as of the tracts of land under lease and under the unitization agreement. It was provided that the unitization agreement should constitute a covenant running with the leases and contracts on land covered thereby, and that such leases should be modified only to the extent they were changed or affected by the unitization contract.

In early 1945, after payment by lessee on the lease upon appellants' large tract the delay rental for January 15, 1945 entitling lessee to delay any drilling until January 15, 1946, a well which proved to be a non-producer or "dry hole" was drilled on one of appellants' tracts, which was abandoned as a "dry hole" and plugged on April 7, 1945. This drilling operation on appellants' large tract was performed pursuant to the purposes of the unitization agreement of 1944, and was the operation all parties had in mind when they joined in the unitization agreement. The date of the abandonment and plugging on April 7th was prior to the date in 1945 that the delay rentals were due on the lease covering the small tract of appellants. Subsequent accruing delay rentals were paid on this lease to appellants, and accepted by them on or before the dates they became due. Following April 7, 1945, there was no drilling activity on any of the tracts unitized under the 1944 agreement until January 9, 1951. During this period, the primary term of five years provided for in the Miller lease expired, and Miller re-leased his land under a new oil and gas lease, beginning in 1946. All the delay rentals accruable as provided by the individual leases upon both of appellants' tracts were paid annually by the lessees thereof and accepted by the appellants.

Then on March 9, 1949, all the lessors of oil and gas leases under the 1944 unitization agreement, except the appellants, got together with the lessees under their total of 555.23 acres of land, and entered into a new unitization agreement as to oil and gas produced from such acreage, and contracted identically as in the case of the 1944 unitization agreement, in so far as the purposes of this appeal are concerned. Appellants were left out, and each of the new lessors as to the 1949 unitization agreement of course had as to any oil and gas produced, proportionately increased interests therein by the non-inclusion in the new agreement of the appellants on whose land the well drilled in 1945 had proven to be a "dry hole." On March 24, 1951, a producing oil well was brought in on one of the leases under the 1949 unitization agreement. Sometime after May 24, 1951, the appellants authorized the bringing of this suit, its purpose being to enforce the rights recited in the unitization agreement of 1944.

As to the "dry hole" drilled on appellants' large tract in 1945, the lessees, under and by virtue of the 1944 unitization agreement, caused the initiation of drilling operations upon such tract within the period contemplated by the said agreement as to such initiation. After prosecuting the drilling to a depth of 9,999 feet, considerably

below the depth at which a well referred to in the unitization agreement as the Gay et al. No. 1 was producing, and below deepest sands, or zones, from which said well was producing, as the levels of such sands existed under the lands of appellants, operations ceased as having proven a "dry hole." No production of oil or gas whatever was realized even at 9,999 feet and such "dry hole" was "plugged" on April 7, 1945, and all work upon such as a well drilled in pursuance of search for oil or gas was abandoned. There was never any commencement of any operations for the drilling of another well for any purpose upon any of the lands involved under the 1944 unitization agreement, until drilling operations were begun in 1951 under the 1949 unitization contract upon one of the properties unitized under such 1949 agreement.

Nowhere in the unitization agreement of 1944 was there specifically stated any provisions as to what would occur if the well to be drilled should be a "dry hole." Pertinent parts of section VII of the agreement provided: "This agreement shall be null and void unless Lessees shall commence operations *for the drilling of a well for oil or gas * *. ** within 120 days from the effective date hereof, * * * and prosecute the drilling thereof with due diligence *to a depth sufficient to test the Zones from which the Gay et al. No. 1 well in the Tumlinson League is now producing, unless oil and/or gas is found in paying quantities at a lesser depth. * * * * Failure of Lessees to so commence operations for the drilling of said well or to prosecute the drilling thereof as above specified shall terminate this Agreement as to all parties and all parties shall be relieved of all obligations and liabilities with respect thereto, provided, however, that if after drilling operations are commenced the Lessees are for any reason unable to complete said well as above provided this agreement shall not terminate if Lessees shall within 90 days after the abandonment of said well commence operations for the drilling of another well in lieu thereof; and prosecution of drilling of said well to completion as above

stipulated shall satisfy the drilling provision herein contained." (Emphasis ours.)

As to its purposes there is no ambiguity that under the express provisions of the contract as to drilling operations such operations were to constitute the "drilling of a well for oil or gas." Additionally, the depth to which such drilling operations were to extend was provided, to-wit: "to a depth sufficient to test the Zones from which the Gay et al. No. 1 was producing." Even the carrying of the drilling operations to that depth was not mandatory nor prescribed as the purpose for which the drilling operations were to be undertaken, for the lessees by the terms of the contract were to go no deeper than some lesser depth in the event oil or gas in paying quantities was found at a lesser depth. The well was provided to be drilled primarily in a search for oil or gas, and any "testing" as to the zones from which the Gay et al. No. 1 well was producing would have been, if anything, subsidiary, and indeed discretionary, in so far as the contract was concerned. The lessees were not by the terms of the contract obliged to do any testing of the zones from which the Gay et al. No. 1 was producing, and it was not required of them to provide facilities necessary to the conduct of any test of such zones, nor to exercise them in making a test if they had them. Indeed, they were not required to even drill that deep if more shallow paying production was discovered. The only obligation such provision of the contract made upon lessees was that they conduct the drilling operations (absent earlier findings of paying production) to a determinable depth, which could have as well been stipulated by prescribing the depth to which they would drill in linear feet.

Further, the contract provided that if lessees should for any reason be unable to complete the well, and so should abandon prosecution of drilling operations upon it, the lessees should have an extension of the unitization agreement of ninety days from the date of such abandonment, in which lessees could commence drilling operations at another location within the unitized area, and such drilling operations com-

menced at such new location would be with all the rights and benefits under the unitization contract as provided had not the well first begun under its provisions ever been abandoned.·

■ As to a well being drilled for oil or gas, the terms "abandon" or "abandonment," within the contemplation of the Texas laws relating to oil and gas, mean (as reflected by Title 102, V.T.R.C.S., Articles 6004, 6005, 6010, 6012 and 6029) to abandon all work upon such a well in pursuance of the search for oil or gas; and these articles also indicate the responsibility of the owner or operator to plug or fill the same upon abandonment of such work. It will be noted that in this case the well in question was "plugged" or filled as provided by these Articles on date of April 7, 1945. The "well," as it was hopefully termed by all parties until drilling operations ceased, was one which was abandoned under contemplation of the laws of this state, regardless of the purposes for which it was drilled, and it was abandoned likewise within the provisions as to abandonment under the unitization agreement of 1944.

■ When speaking of completed or abandoned locations where drilling operations occurred in a search, the general intent and leading purpose of which was to produce oil or gas, oil-field terminology denotes such as "oil wells," "gas wells" and "dry holes." A "dry hole" will therefore never be considered a well of any kind or character with respect to a contract for the drilling of a "well" for oil or gas, unless by express wording of the contract, or by necessary implication from the general intent and leading purpose to be accomplished thereby, it must be so considered. 10 Tex. Jur., p. 272, sec. 159. Likewise, the term "well" will never be considered to be and designate a "dry hole" unless it must be so considered after application of the same tests. A demonstration of a type of contract which would be an exception would be one expressly or primarily for the purpose of "testing" as opposed to search for oil or gas. The drilling section of the unitization contract in question does not fall into this category.

■ Though the unitization agreement of 1944 does not specifically make any applicable provisions if the drilling operations should develop a "dry hole," the leases of both of appellants' individual tracts do make such provisions. These leases were made a part of the unitization agreement, and all parties will be presumed to have the terms and conditions thereof in mind in the execution of the unitization agreement so incorporating them. 10 Tex.Jur., p. 286, sec. 166.· There were certain rights prescribed by the parties to the individual leases of appellants, which rights were conditional as to the lessees therein, just as there were certain rights prescribed by the parties to the unitization agreement which were conditional as to the lessees thereunder. As to the individual leases, the lessees therein upon the drilling of a "dry hole" were to comply with the terms of the lease on which it was drilled with reference to the resumption of payment of delay rentals or forfeit the lease. It is noted that the lessees under these individual leases did keep up their payments of delay rentals in order to keep them from being forfeited, and the appellants accepted these payments as such. It goes without saying that if the drilling operations had resulted in an "oil well" the appellants would not have been entitled to any delay rentals because the condition of the lease with reference to production would have been performed by the lessees which would stop the obligation with respect to delay rentals, and the appellants would be expecting the payment of royalties from production. It likewise goes without saying that if drilling operations should have been initiated and been in progress upon appellants' tracts under lease upon the date when the lessees' obligation to pay delay rentals would otherwise have fallen due to be paid in order to keep the leases from being forfeited, the appellants would not have been entitled to any delay rentals because the condition of the leases with reference to drilling operations was in the process of being performed, and subject to the success of which oil or gas production might ensue, which would, if it did prove to be the result of the drilling operations become a complete performance by

the lessees. If such resulted, the payment of delay rentals would never again become the obligation of the lessees so long as oil and gas in paying quantities continued of production. However, if the result of the drilling operations proved otherwise, and to have been conducted upon a "dry hole," abandoned as such, the obligation of the lessees with respect to drilling or to otherwise pay delay rentals, *suspended during the drilling operations and perhaps for a prescribed time after such operations*, is revived. The interest of the appellants under the unitization agreement of 1944 was a conditional and contingent determinable estate *under which the obligation of appellants and their lessees under the individual leases were suspended but not substituted.* If the condition upon which depended the contingent estate of appellants under the unitization agreement failed, all the obligations of appellants and their lessees under such individual leases would again become incumbent upon them. If the lessees under the individual leases did not wish to forfeit such leases they were obliged to start drilling operations, or to resume delay rental payments. Duff v. Du Bose, Tex Civ.App., 1929, 14 S.W.2d 911 (Beaumont), affirmed by Supreme Court in 1930, 27 S.W. 2d 122.

The parties to the 1944 unitization agreement stipulated therein that the lessors and lessees under the individual leases involved were reserving all their rights under such various leases by the words: "Nothing herein contained shall be construed as altering or impairing the provisions of said leases *. * *." This reservation was made a condition which would be temporarily suspended under certain circumstances, and would fall and be dissolved upon the happening of an event or performance of a condition, the occurrence of which would merge or convert all the rights of the various parties under the individual leases into other and different rights under the unitization agreement.

That condition, upon occurrence of which the reservation of interests under the individual leases *would be suspended,* was prescribed by the contract to be while drilling or other operations were being conducted upon any land in the unitized area; and that condition, upon occurrence of which the reservation of interests under the individual leases *would fall and be merged or converted into other rights,* was prescribed by the contract to be the production of oil, gas, or other minerals on any land within the unitized area. Both events would, in so far as the periods involved as to either or both being operative, result in the treatment of the leases and tracts leased as an entirety as though all such lands were under one lease from one lessor to one lessee. Analysis of section II of the unitization agreement compels this conclusion. Such section reads, as to pertinent provisions, as follows: "The leases and tracts of land in the Unitized Area are to be considered and treated as an entirety as to oil, gas and other minerals just as though all the lands in the Unitized Area had been included in one lease covering all said lands, and the production of oil, gas, or other minerals, *or the conducting of drilling or other operations on any land within the Unitized Area shall have the same effect for all purposes under the terms of the leases included within said Unitized Area as if such production were from or drilling or other operations were on each of the pooled leases in said Unitized Area. * * *"* (Emphasis ours.)

Hence, the institution of the drilling operations upon a part of the unitized area suspended the obligation of appellants' lessees to pay any delay rentals which might otherwise fall due to be paid appellants during the period in which the drilling operations were in progress; and, should such operations have proven successful and production have been realized, such lessees would never thereafter be obligated to pay any delay rentals to appellants so long as the production continued in paying quantities. However, the drilling operations proved unsuccessful, and the hoped for "well" proved instead to be a "dry hole." Therefore, the terms of the unitization agreement enuring to the benefit of the lessees thereunder while the drilling operations were in progress and suspending their obligations, if any under their several individual leases to pay delay rentals, ceased of operation. The various

lessors who had joined in the unitization agreement were thereafter entitled to be paid any delay rentals which might come due under their several leases involved. The rights and duties of the parties under the agreement ceased, and rights and duties under individual leases were reinstated. The appellants did have delay rentals paid to them after the drilling of the "dry hole" and cessation of all further drilling operations by their lessees. Appellants accepted such payments as being for delay rentals owing under the individual leases. By accepting such payments they, as a matter of law, waived any rights to contend the continuation in existence of the unitization contract or to contend for any rights thereunder as such would be inconsistent with their rights under the individual leases. By choosing to accept the delay rentals paid subsequent to the time the "dry hole" was drilled, the appellants elected to assert rights under the individual leases. Having so made an election in this regard, they may not maintain the wholly inconsistent position which is necessarily taken when they assert any rights under the unitization agreement, particularly when they do not tender to their lessees (appellees with others herein) the delay rentals so paid under an averment of fraud or mistake. Doty v. Barnard, 1898, 92 Tex. 104, 47 S.W. 712; 17 Tex.Jur., p. 135, sec. 7.

The fallacy of appellants' premise in bringing this suit is demonstrated by viewing as correct their contentions. Viewing such as correct the unitization agreement of 1944 would need be considered as permanently fixing the rights of all parties to the oil and gas under the entire area, with no obligation left upon anyone to undertake or pursue any operations whatever to secure any production. The various lessees would not owe any delay rentals to anyone, and their rights and interests under the various leases would be perpetual and there would be no occasion to re-lease any of the individual leases which might, except for the unitization agreement, expire by their terms. The various lessors (including appellants herein) could never be complete owners of the minerals under their lands except by purchase from, or otherwise re-ceiving from their lessees and from one another the interests appellants claim have been conveyed. Injustice, rather than justice, would result to every lessor affected. The law is a system of rules, the object of which is to effect justice, and justice results (with certain necessary exceptions) upon the application of such rules. Application of such rules to this case necessarily requires the conclusions expressed.

The judgment of the trial court is affirmed.