387 P.2d 342

**HONDO OIL & GAS COMPANY, Western Development Company of Delaware, Yates Brothers and Yates Petroleum Corporation, Plaintiffs-Appellants,**

**v.**

**PAN AMERICAN PETROLEUM COR-PORATION, Defendant-Appellee.**

**No. 7241.**

Supreme Court of New Mexico.

Nov. 25, 1963.

Losee & Stewart, Artesia, James T. Jennings, Roger L. Copple, Roswell, for appellants.

Atwood & Malone, Roswell, for appellee.

MOISE, Justice.

On May 22, 1952, the parties hereto entered into a master agreement whereby defendant-appellee was granted the exclusive right for a period of six months to conduct geophysical explorations on some 20,000 acres of leases owned by plaintiffs-appellants. The master agreement provided that within 60 days after the expiration of the 6-month exploration period, the defendant had a right to select 3 blocks of acreage of 2560 acres each, and that plaintiffs would convey an undivided one-half working interest therein below a certain depth.

The exploratory work was done, the selections made, the conveyances executed, and on February 21, 1953, operating agreements were entered into by the parties. The operating agreement covering Block I, here involved, (hereinafter referred to as the "agreement") provided for the drilling by defendant of a test well at its own expense at a location to be selected by it on the acreage. The agreement further provided that within 90 days after completion of the test well, defendant should drill a development well, and thereafter additional development wells should be commenced within 60 days after the completion of each well.

The defendant had the right to recover its costs of the development wells out of 75% of plaintiffs' share of production. Defendant had the right to abandon the drilling program at any time without liability, but, subject to certain exceptions, upon doing so was required to reconvey the interests in the leases which had been transferred to it. Differences between the parties as to the proper interpretation of Article 6 of the agreement gives rise to the present litigation. This article is entitled, "Drilling of Development Wells." We set it out in full for a better understanding of the problem:

"Within ninety (90) days from and after completion of the test well provided for in Article 2 hereof, Operator shall commence the actual drilling of an additional well on the lease acreage covered hereby at a location of Operator's selection, and thereafter, shall prosecute the drilling of said well diligently and in a workmanlike manner to a depth of Operator's selection. Thereafter, Operator shall conduct a continuous drilling program on the lease acreage covered hereby, with an interval of not more than sixty (60) days between the completion of one well and the commencement of an additional well. All such wells shall be drilled at locations of Operator's selection and shall be drilled to those depths selected by Operator on the lease acreage covered hereby. Unless a particu-

lar well (excluding the test well referred to in Article 2 hereof) to be drilled by Operator on the lease acreage is designated by Operator as being drilled under the provisions of this Article 6, such well shall be deemed to be drilled under the provisions of Article 12 hereof. If at any time during the existence of this agreement, Operator shall discontinue the drilling program provided for in this Article 6, then in that event, Operator shall in no manner be liable to Non-Operators, in damages or otherwise, by reason of such discontinuance; but the Operator shall execute and deliver to Non-Operators, in the proportions of their interests in the lease acreage covered hereby, a conveyance of all of Operator's right, title and interest in the lease acreage covered hereby, * * * such conveyance to be free and clear of all encumbrances not existng on the date hereof and not placed thereon by the mutual consent of the parties hereto; provided, however, that such conveyance shall not include a tract surrounding each well drilled on the lease acreage covered hereby equal to that area surrounding such well prescribed for one well by the spacing rule of State or Federal authority having jurisdiction, provided, that if there be no such established spacing rule, such conveyance shall not include a legal subdivision of forty (40) acres surrounding such well if it is an oil well, or a legal subdivision of one-hundred sixty (160) acres surrounding such well, if it is a gas well; and provided, further, that with respect to the area around each well to be excluded from such conveyance, as hereinabove provided, such exclusion shall cover and include only the depth sufficient to include the formation to which such well was drilled."

We continue with the facts about which there is no controversy. The test well was completed as a gas well on Block I, whereupon the New Mexico Oil Conservation Commission, on November 25, 1953, entered its order No. R–391 establishing the Empire-Pennsylvanian Gas Pool and providing for 320 acre spacing.

Thereafter, the parties agreed that the first development well should be drilled on the N½ of Section 32, Township 17 South, Range 28 East, N.M.P.M., the NE¼ being included in Block I selected by defendant, and assigned by plaintiff, and further agreed that if it was drilled on the NW¼ of that section it would be considered as a development well under the agreement. Defendants were granted an extension of time for ccmmencing the well since the NW¼ was not included in the blocks in which an interest had been assigned to defendant, and was not owned by plaintiffs. However, a unitization agreement between the owners of the leases on the NW¼ and

NE¼ was entered into on December 29, 1953 and a well designated as a gas well projected to the Empire-Pennsylvanian pool was commenced by defendant on January 8, 1954. The well was non-productive at this depth, but was thereafter completed as an oil well in the Wolfcamp formation, this being a shallower depth, but within the horizons in which defendant had an interest under the assignments from plaintiffs. However, the Wolfcamp formation was not covered by the unitization agreement, and plaintiffs had no interest in the production therefrom.

The defendant did no more drilling on Block I, and under date of April 1, 1955, a "conveyance of operating rights" was executed by the parties, with a reservation in defendant of an undivided ½ interest in an area surrounding the test well, and in the NE¼ of Section 32, Township 17 South, Range 28 East, N.M.P.M. "from a depth of 3500 feet below the top of the San Andres formation down to the base of the Pennsylvanian formation."

Nothing further occurred until August 25, 1959, when plaintiffs requested that defendant assign the interest reserved in the NE¼ of Section 32. Plaintiffs assert it was then that they first realized that defendant still claimed an interest therein. Plaintiffs also point out that on April 1, 1955, when the conveyance of operating rights was made, the property was bound by the unitization agreement with the NW¼, and

that by its terms the unitization agreement remained in effect until April 14, 1956. For this reason the plaintiffs claim the original reservation was proper, and after April 14, 1956, their right to a reconveyance was overlooked.

On the other hand, defendant points out that the correspondence between the parties at the time the conveyance was made on April 1, 1955 described the same as including "all unearned rights in Block I," thereby clearly indicating the reserved interest was understood to have been "earned" when the reconveyance was made. Also, attention is called to the fact that in 1959 the property had suddenly acquired an increased value by virtue of a 1957 oil discovery in the Abo Reef, and that in 1959 and 1960 the field was moving in the direction of the NE¼ of Section 32.

After answer in which four defenses were raised, all parties filed motions for summary judgment, and defendant's motion was sustained by the trial court. Evidence was taken only on the defense of laches, and on this issue the court also found in favor of defendant.

By its ruling sustaining the motion for summary judgment, the trial court determined that Article 6 of the operating agreement quoted above did not require the defendant to reconvey to plaintiffs the NE¼ of Section 32, Township 17 South, Range 28 East, N.M.P.M. This is asserted to have

been error in plaintiffs' first point on this appeal.

All parties, while putting different constructions on Article 6, maintain that it is unambiguous. It is well settled in New Mexico that where the language of a contract is clear and unambiguous, the intent of the parties must be ascertained from the language and terms of the agreement, Fuller v. Crocker, 44 N.M. 499, 105 P.2d 472; Hoge v. Farmers Market and Supply Company of Las Cruces, 61 N.M. 138, 296 P.2d 476; Ashley v. Fearn, 64 N.M. 51, 323 P.2d 1093, and in this connection all parts of the instrument shall be given effect so as to make all provisions of the document reasonable and harmonious. Maffett v. Emmons, 52 N.M. 115, 192 P.2d 557.

Specifically, the issue which we are called upon to determine is the meaning of the word "well" as that word is used in Article 6. It is plaintiffs' position that the word means only "producing wells," whereas, defendant contends that a "completed dry hole" was also intended by the parties to be included in the term.

Plaintiffs direct our attention to other language of the agreement which they assert throws light on the intention of the parties. Article 2 provides, "All costs and expenses incurred in connection with the drilling, completing, testing, equipping and, if a *dry hole,* the plugging and abandoning of said *test well* * * *." Article 7 provides "Operator initially shall advance and pay all costs and expenses for the drilling, completing, equipping and, with respect to *dry holes,* the plugging and abandoning of *all wells* drilled on the lease acreage covered hereby," and further that the operator shall receive the proceeds from production " * * * until such time as Operator has received from Non-Operator's interest in *such wells* * * * a sum equal to 100 per cent of Non-Operator's proportionate share of the cost of drilling, completing, equipping, and with respect to *dry holes,* plugging and abandoning such *wells,* whereupon such *wells* and the production therefrom shall be owned jointly by the parties hereto in the portions set out in Article I hereof." Article 12, dealing with "Additional Drilling" speaks of completing a well as a *"producing well."* Article 13 states that "No well which is producing or has once produced shall be abandoned, * * *" without reference to "dry holes." It is argued that Article 13 is practically identical in language to Article 6, and since in this article only producing wells are referred to, it is here asserted that such must have been the intention when the term "well" was used in Article 6.

Our analysis of the various articles to which plaintiffs refer as supporting their interpretation, convinces us that the defendant's position is correct. Whereas in Article 6 the reference is to "wells" with no mention of "dry holes" or "producing

wells," it seems significant to us that in the language quoted from Articles 2 and 7, "dry holes" are in each instance described as "wells." To our minds, this usage of the term "wells" in these articles to include "dry holes" is conclusive of the argument in favor of defendants under the rules of contract interpretation set forth above. Articles 12 and 13 in no way detract from our conclusion, since these articles deal only with "producing wells" or wells which have at one time been "producing wells," and the purpose of the articles was clearly stated without any need to make references to "dry holes."

Whether the articles of the agreement dealt with exploration or development is to our minds quite unimportant in resolving our problem here since we are doing nothing except interpreting the language used by the parties, and we have no reason to assume that they were not equally careful in their choice of words in Article 6 as elsewhere in the document.

Although our attention has not been called to any case where an identical provision to the one here being examined was involved, and we have found none, we do note that under various circumstances "dry holes" have been recognized by the courts as "wells."

One such case is Brown v. Homestake Exploration Corporation, 98 Mont. 305, 39 P.2d 168, 173. That case involved the interpretation of a contract wherein it was provided that "the party of the first part hereby binds itself to the exercise of reasonable diligence in the drilling of oil wells on such premises to such number and extent as said premises will admit of." The court had the following to say concerning the language:

"* * * It is argued that an 'oil well' means a well which produces oil, and that the drilling of a well seeking the discovery of oil is not an oil well; and hence the covenant is only operative after the discovery of oil.

"The words of a contract are to be understood in their ordinary and popular sense, unless used in a technical sense. Section 7535, Rev.Codes 1921; Solberg v. Sunburst Oil & Gas Co., 73 Mont. 94, 235 P. 761. An 'oil well' is defined as a 'well or boring for petroleum.' Funk & Wagnalls Dictionary. 'A boring made for petroleum.' Century Dictionary. * * *"

The quotation is followed by pointing out that the Montana mechanics' lien laws provide for liens in connection with furnishing labor and materials on "any oil or gas well." If a dry hole were not considered to be within the term "oil or gas well," without discovery of oil or gas, there could be no lien. However, the court had already held otherwise in Cheadle v. Bardwell, 95 Mont. 299, 26 P.2d 336.

The situation in New Mexico is closely similar. See § 65–5–1, N.M.S.A.1953. Decisions under our general mechanics' lien law indicate that we would probably reach the same result. Albuquerque Foundry & Machine Works v. Stone, 34 N.M. 540, 286 P. 157; Dysart v. Youngblood, 44 N.M. 351, 102 P.2d 664.

Minerva Oil Company v. Sohio Petroleum Company, 336 Ill.App. 372, 84 N.E.2d 167, involved the interpretation of an oil lease to determine if the term "wells drilled" included both dry holes and producers for the purpose of determining the amount of production required before a change of royalty payment should become effective. In holding that all wells, whether producing or not, should be included, the court said:

"＊ ＊ ＊ It seems clear to us that the designation 'wells drilled' as used in the first and second sections includes and means any well that has been drilled to the proper depth be it producing or not. The phrase characterizes what was done by the lessee and has no reference to productivity. ＊ ＊ ＊"

Supporting the conclusion that "well," when used in a lease, means a hole drilled to the depth at which production is to be expected, whether actually encountered or not, are the following: Kies v. Williams, 190 Ky. 596, 228 S.W. 40; Frost v. Martin (Tex. Civ.App.1918) 203 S.W. 72; Chapman et al. v. Ellis (Tex.Civ.App.1923) 254 S.W. 615;

Federal Betterment Co. v. Blaes, 75 Kan. 69, 88 P. 555; Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W.Va. 583, 42 S.E. 655, 59 L.R.A. 566; Hall et al. v. McClesky (Tex.Civ.App.1921) 228 S.W. 1004.

In Frost v. Martin, supra, a case involving construction of language in a lease, we find the following which we consider pertinent:

"＊ ＊ ＊ We think that in the sense the word 'completed' is used in this contract it means finished, or sunk to the depth necessary to find oil or gas in paying quantities, or to such a depth as in the absence of such oil or gas would reasonably preclude the probability of finding oil or gas at a further depth. It should not be construed to mean that the lessee bound himself, under the penalty of a forfeiture, to sink a well or oil or gas in paying quantities, or, in the absence of oil or gas, to bore through to China. It therefore became a material question as to whether the hole drilled to the depth of 2,103 feet was a 'completed' well, as that word was used and understood by the parties."

In Esso Standard Oil Co. v. Nesbitt, 222 La. 661, 63 So.2d 417, the court was called upon to construe whether or not dual completion of a well constituted one or two wells under the language of a mineral lease assignment. We find the following language used by the court:

"Inasmuch as the parties were uninformed as to dual completions at the time they contracted, it is obvious that this method of recovery was not within their contemplation. Hence, it is to be presumed that, when they spoke of an oil well, they used the term in its common and usual signification. Article 1946 of the LSA–Civil Code. A well is generally understood to be 'A shaft or hole sunk to obtain oil, brine, gas, etc. * * *' Webster's New International Dictionary, 2nd Ed. 1950, and, as applied to oil, has been defined by this court to be a hole ' * * * to be drilled into the earth with the hope that it may become a well through which oil and gas may be produced * * *'. Knight Bros. v. Standard Oil Co., 147 La. 272, 84 So. 653, 654."

Knight Bros. v. Standard Oil Co., 147 La. 272, 84 So. 653, cited in the quotation above, is relied on by plaintiffs as stating that a "producer" is a "well" but that a "dry hole" is not. True, the case so held insofar as those terms were used in the oil leases there being construed. The net effect was that whereas a "producer" would hold a lease without the necessity of commencing a new "well," a "dry hole" would not. With this conclusion under the facts of that case, we find no fault. However, the meaning as determined in Esso Standard Oil Co. v. Nesbitt, supra, is here applicable.

Plaintiffs put particular faith and reliance on Struss v. Stoddard (Tex.Civ.App. 1953) 258 S.W.2d 413, wherein it was held that "a dry hole will * * * never be considered a well of any kind or character with respect to a contract for drilling of a 'well' for oil or gas, unless by express wording of the contract, or by necessary implication from the general intent and leading purpose to be accomplished thereby, it must be so considered." We are satisfied that the conclusion reached by us is not in conflict with the rule as stated. However, if it is, we prefer the reasoning of other decisions cited and relied on by us.

Defendant asserts that because of subsequent decisions (See Kothmann v. Boley (Tex.Civ.App.1957) 301 S.W.2d 235, reversed in Kothmann v. Boley, 158 Tex. 56, 308 S.W.2d 1) Struss v. Stoddard, supra, is of questionable force today. In the view we take of the case, as set forth, we need not consider whether or not this is true.

In our case of Totah Drilling Company v. Abraham, 64 N.M. 380, 328 P.2d 1083, we clearly held in construing a "turn-key" drilling contract that a "well" was completed under the terms of the agreement when the acts contemplated therein had been performed, and whether or not the well was a producer. We there held that under this type of contract the parties intended the testing of a formation and "completion of a producing well or aban-

donment as a dry hole" for the consideration provided, and that unless expressed otherwise the driller would not be held to have guaranteed production, citing 4 Summers Oil and Gas, § 687 (Perm. Ed. 1938).

To like effect is Cannon v. Wingard (Tex.Civ.App.1962) 355 S.W.2d 776, holding that a lease providing for the drilling of a well does not contemplate that a "producing well" is guaranteed. This case further held that an agreement to complete the well within a given time did not constitute an obligation to complete it as a producer, citing Totah Drilling Company v. Abraham, supra.

The plaintiffs argue that these cases are not of assistance in resolving our problem because the "turn-key" contract is one requiring payment upon completion of the drilling and provides the drilling contractor with his only compensation; whereas here, although having an interest in the leasehold, the defendants were not to be paid for drilling except out of production. We do not agree that the cases can be distinguished on this basis. In both situations, the driller is expending his efforts for compensation— in the turn-key situation it is generally for return of costs plus a profit in money; here it is for return of costs out of production if oil or gas are encountered and, in addition, the operator is entitled to an interest in the well drilled by it. Compare contract in

Texas Pacific Coal and Oil Company v. Honolulu Oil Corporation (C.A. 5, 1957) 241 F.2d 920. Also compare contract in Yates v. American Republics Corporation (C.A. 10, 1947) 163 F.2d 178.

There still remains the question of the amount of acreage defendants had the right to reserve under the provisions of Article 6. The language reads:

" * * * that such conveyance shall not include a tract surrounding each well drilled on the lease acreage covered hereby equal to that area surrounding such well prescribed for one well by the spacing rule of State or Federal authority having jurisdiction, provided, that if there be no such established spacing rule, such conveyance shall not include a legal subdivision of forty (40) acres surrounding such well if it is an oil well, or a legal subdivision of one hundred sixty (160) acres surrounding such well, if it is a gas well; * * *."

As already noted, the Oil Conservation Commission had promulgated Order No. R-391 providing against drilling to the Empire-Pennsylvanian Gas Pool, unless the well "be located on a designated drilling unit of not less than 320 acres of land, * * * and on which no other well is completed, or approved for completion in the pool." It is quite clear in the language

of the order that the spacing attaches not as of the date of completion, but as of the time of approval of a drilling permit following filing of a Notice of Intention to Drill. In the instant case the Notice of Intention covered a well projected to the Empire-Pennsylvanian Gas Pool and 320 acres spacing attached.

We have already discussed the effect of failure to obtain production. Plaintiffs assert that the provision for reservation of 40 acres surrounding an "oil well" and 160 acres surrounding a "gas well," in the situation where no spacing has been established, demonstrates that no retention of acreage was contemplated if the efforts resulted in a dry hole, as distinguished from an oil or gas well. Again we must disagree with plaintiffs' position.

The clear language of Article 6 provides for retention of acreage in the amount required by the spacing rule of the State. As already noted, in the instant case this was 320 acres, fixed by order at the time of approval of Notice of Intention. If a well had been completed as an oil well, or as a gas well, in a zone other than the Empire-Pennsylvanian Gas Pool, and no spacing order or rule had been established, then the 40 and 160 acre provision of the Article would come into play. However, that is not our situation. Spacing of 320 acres had been required and complied with through a unitization agreement. The well was drilled in good faith to the depth required to demonstrate an absence of gas at that level. By what reasoning is it now claimed that the agreed spacing was not applicable?

Plaintiffs suggest that if defendant is entitled to anything, it is 40 acres surrounding the well because this is the spacing approved for an oil well in the Wolfcamp formation. Plaintiffs point out that to allow defendant an interest in 320 acres because of the Empire-Pennsylvanian Gas Pool spacing when in fact the well is a Wolfcamp oil well works an injustice to plaintiffs, whereas in slightly different situations set forth in their brief the result would be otherwise. Be this as it may, as already stated several times we are confined to the language used by the parties. We would agree that if the well had been projected to the Empire-Pennsylvanian Gas Pool, and upon encountering oil in the Wolfcamp formation before reaching the gas pool, and completion of the well at that time as an oil well, the 40 acre spacing applicable in such a situation would apply. However, the situation is materially different under the facts of this case where the well was sunk to the originally projected depth and formation, but without success, and this was followed by the completion in the shallower Wolfcamp oil formation. The same would be true if gas had been encountered at a les-

ser depth and the well completed as a gas well at that point. Absent a spacing order, only 160 acres could be retained. We are satisfied that under the facts here present the trial court correctly construed the contract, and our discussion of hypothetical possibilities is intended merely to demonstrate the application of the quoted language.

We are fortified in our conclusion, if indeed bolstering were needed, by the fact that the parties themselves so construed the contract for more than four years, and until the value of the property was much increased because of new discoveries in the neighborhood.

In Fraser v. State Savings Bank, 18 N.M. 340, 137 P. 592, we stated:

"Counsel for appellant next insists that the agreement, entered into by the parties, did not constitute a partnership contract, but was at most a brokerage agreement. Had the parties to the contract not treated it as constituting a partnership agreement, we would be inclined to agree with counsel; but all the acts of the parties, and circumstances in evidence, from the time of making the contract in December, until the conclusion of the sale to Martin, plainly show that Fraser, and Bidwell and Probert, recognized that a partnership existed between them by virtue of said contract, and treated each other accordingly. Having placed a construction upon the contract, and acted thereunder, the court will not, at this time, and after all the rights have accrued, give to the contract a different construction, which would plainly be at variance with the understanding of the parties to it. 30 Cyc. 360."

It is clear from the quotation that absent recognition of the agreement as creating a partnership, the court might have been disposed to determine otherwise. How much more convincing is the treatment given by the parties when it conforms generally to what appears to us to be the clear intention expressed in the language used. Compare Jernigan v. New Amsterdam Casualty Company, 69 N.M. 336, 367 P.2d 519.

It is evident that the fact that defendant had retained an undivided working interest in the NE 1/4 of Section 32 "from a depth of 3500 feet below the top of the San Andres formation down to the base of the Pennsylvanian formation," was not overlooked by plaintiffs since the conveyance signed by "all" the parties shows that as drawn it provided for retention of all rights therein, and this was changed by interlining the words "an undivided 1/2 interest in" and initialling the same. Also we note that the interest retained included "the depth sufficient to include the formation to which such well was drilled" in strict accordance with the provisions of Article 6. In the light of these facts we are not impressed

**252**

with plaintiffs' statement that it was not until August 25, 1959, that plaintiffs first realized that defendant was still claiming an interest in the 160 acres here involved. The situation here present is not comparable to that ruled on in Texas Pacific Coal and Oil Company v. Honolulu Oil Corporation, supra, since the conveyance accorded with the agreement calling therefor. It more nearly coincides with situations present in Greene v. White, 137 Tex. 361, 153 S.W.2d 575, 136 A.L.R. 626, and in Klein v. First National Bank (Tex.Civ.App.1953) 266 S. W.2d 448, where grantees were held bound by the terms of deeds even though not signed by them.

Neither are we convinced that the fact that the NE¼ had been unitized with the NW¼, and that the unitization agreement was still in force on April 1, 1955, made any difference. It would have been a simple matter to so state in the conveyance. Also, the unitization agreement had expired by its terms long before August 25, 1959.

In view of the conclusions which we have reached, there is no need for us to discuss the question of whether or not plaintiffs should have been barred by their laches.

The trial court ruled correctly and the judgment appealed from should be affirmed.

It is so ordered.

CARMODY and CHAVEZ, JJ., concur.