474 P.2d 494

**James H. WAXLER and First National Bank in Albuquerque, New Mexico, Trustee under the Last Will and Testament of Helen W. Waxler, Deceased, Plaintiffs-Appellees,**

v.

**HUMBLE OIL & REFINING COMPANY, Defendant-Appellant.**

**No. 8966.**

Supreme Court of New Mexico.

Sept. 14, 1970.

Hinkle, Bondurant & Christy, C. D. Martin, Paul Kelly, Jr., Roswell, for defendant-appellant.

Nordhaus & Moses, Albuquerque, for plaintiffs-appellees.

## OPINION

SISK, Justice.

Defendant, Humble Oil & Refining Co., hereafter referred to as Humble, appeals from a judgment awarding damages to plaintiffs, James H. and Helen W. Waxler, hereafter referred to as Waxler, for breach by Humble of a service station lease agreement.

In February, 1962, Humble leased from Waxler, for use as a service station, certain land and improvements, together with all rights and appurtenances thereto, which had previously been operated by Waxler as a service station. Prior to execution of the lease, both parties knew that there existed a New Mexico State Highway Department right of way in front of the leased premises and that a highway widening and improvement project was contemplated, although they did not know the extent of the widening or its effect on the use of the leased premises.

Paragraph 7 of the lease specifically provided for rental adjustment during any period of access impairment by reason of governmental construction, as follows:

"During any period that access by the motoring public to the premises is impaired by reason of any street opening, widening, repair, or other work undertaken by or with the consent of any municipal, state, or other governmental authority, Lessee may, at its option, pay a rental of One Cent (1¢) for each gallon of gasoline and other motor fuels sold during such period, and such payment shall be in lieu of the rental provided in the Rental article above apportionable to such period."

However, because after completion of the highway construction the beneficial use of the leased premises as a service station facility had been permanently impaired and restricted, Humble sought to terminate the lease agreement by exercise of the rights granted to it under paragraph 2, which provided in its material part:

"If at any time during the term of this lease, however, Lessee shall in any manner be restricted or prevented from using the leased premises for such purpose by reason of inability to obtain said necessary licenses or permits, or by any use restriction, law, ordinance, injunction, regulation, or order of any properly constituted governmental authority,

or by proceedings to enforce same, or by bona fide inability to obtain labor or materials, or by other causes beyond the control of Lessee, this lease may thereupon be terminated by Lessee by giving Lessor thirty (30) days' notice of its intention so to terminate. From and after the date of such termination, Lessee shall be relieved of all liability hereunder."

When leased by Humble the service station had a single pump island which served cars on either side. Access to the inner lane between the gas pumps and the station building, and to the garage and lubrication bay, was most readily gained by turning off the highway on to an oil mat laid on an adjacent lot and thus angling into the inner station area. The outside lane of the pump island served cars which parked on the then unused right of way.

Prior to execution of the lease by Humble, Waxler had obtained, at Humble's request, a survey which certified that none of the improvements on the leased premises encroached on any adjoining property. On June 7, 1963, Mr. Gilbert, Project Supervisor for the State Highway Department, orally requested Humble to remove the gas pumps from the pump island because his survey showed that the pump island, and possibly the pumps, encroached on the right of way which was being utilized in a widening project. On June 11, 1963, Mr. Gilbert sent a letter to Humble reiterating his oral request. Humble removed the gas pumps and sent notice to Waxler of its actions and of the current situation. Waxler subsequently came on to the premises and the alleged encroachment was pointed out to him by Mr. Gilbert. In a letter dated June 17, 1963, Humble notified Waxler that because of the removal of the pumps and other restriction of use, " * * * we have elected pursuant to the terms and conditions of our lease with you to terminate and cancel same."

Humble relies on three points for reversal. Because we hold that the facts pertaining to restriction of use, when applied to the express provisions of the lease, are determinative and require reversal, it is not necessary to rule on the issue of the extent and effect of alleged encroachments or on the issue of constructive eviction. We have also considered the three points raised by Waxler pursuant to Supreme Court Rule 17(2) (§ 21–2–1(17) (2), N.M.S.A.1953), each of which concerns the issue of alleged encroachments, and have determined that because of the basis of our decision it is not necessary to rule on the allegations of error raised by such points.

As a result of the completion of the highway construction project, the means of entry to the service station, as well as its service areas, were severely curtailed. After the widening and installation of curbing, the outside lane of the single pump island was too narrow to be used at all. Further, cars backing out of the lubrication bay would have to back out over the now utilized right of way at the risk of being hit by passing vehicles. Also because of the installation of curbing, cars could no longer angle off merely by driving along the shoulder and across the oil mat on the adjacent property to get into the inside pump island. Yet, Waxler alleges that such severe use restriction should not be included within the provisions of paragraph 2 of the lease agreement, quoted above, because such changes and occurrences were known by or should have been foreseeable by Humble, and because the right of way was being intruded upon prior to the highway project.

Certain unchallenged findings of the trial court dispute such allegations. The court made numerous findings concerning knowledge of Humble including the fact that the lease was prepared in contemplation, among other things, of the highway construction, but it is significant to note in applying the essential facts to the construction of paragraph 2 of the lease, that the court found that when the lease was executed neither Waxler nor Humble

knew the "extent" of the widening project or the "effect" of such widening on the leased·premises. The court also·found that the lease was prepared by Waxler's attorneys, and it is undisputed that paragraph 2 was purposely inserted in the lease to protect Humble.

That use of the premises as a service station was substantially and detrimentally affected by the end results of the completed construction project is unequivocally shown by the trial court's finding as to the resulting change in the value of the premises. The lease negotiated by the parties placed rental value at $200.00, and the trial court found: "That during the remainder of the term of said lease, that is, until March 1, 1977, the highest rental that the Plaintiffs can expect to receive from said premises is Fifty Dollars ($50.-00) per month." Also, Waxler and his appraiser fixed the maximum rental value of the altered premises at only $75.00 per month. Yet, despite the unchallenged findings of fact referred to, and the evidence of material restriction of, and substantial interference with, the use of the premises, the court in its conclusion of law No. 8 construed paragraph 2 of the lease in a manner which denied Humble its contractual right to terminate the lease.

■ In Wood v. Bartolino, 48 N.M. 175, 146 P.2d 883 (1944), this court recognized that parties to a real·estate transaction could contract to relieve themselves from the happening of some event which restricts the use of the leased premises. The court stated: "First, it is the rule that in the absence of an eviction, actual or constructive, or a complete destruction of the leasehold, a tenant is bound to discharge his covenant to pay rent, unless he is relieved therefrom by the happening of some event which by the covenants of the lease terminates it." In our case, the parties negotiated and agreed to all of the terms and conditions expressed in the written lease.

Waxler argues that the parties considered the consequences of highway construction when they inserted paragraph 7 of the lease agreement, providing for an alternative rental payment during temporary impairment of business service. Yet, he would deny effect to a similar recognition of the parties by agreeing to paragraph 2, the terms of which would include a restriction of use resulting from the same construction project. Such reasoning is erroneous, because both provisions were considered, negotiated for, and included within the same instrument. They provide for different rights and they are not contradictory.

■■ The language of paragraph 2 is clear and unambiguous. Its stated purpose is to permit termination if use as a service station is restricted.or prevented by any cause beyond the control of the lessee. Humble had no control over the construction project, and did not know what the extent or the effect of the widening would be. We can reach no conclusion other than that there was such significant restriction of the use of the service station as to permit termination of the lease agreement under the terms of paragraph 2. Because of the full use of the right of way, only half of the gas facilities of the service station, the inside lane of the pump island, were usable. Further, because of the installation of curbing, any car backing out of the service bay would, of necessity, have to back into the curb lane of a busy highway. Even mere entry into the service station's usable area was made a difficult maneuver. Surely, if the parties knew enough of the possibilities which confronted them to provide in paragraph 7 for reduction of rental during periods of temporary business interruption and restriction of use resulting from the highway project, they could as easily have chosen to specifically omit any resultant·permanent restriction or prevention of.use from the scope of paragraph 2, the termination clause, but they did not.

. Real estate leases, like any other written contracts, must be interpreted as a whole to effectuate the intention of the parties, with meaning and significance given to each part in context of the entire agree-

ment. Thigpen v. Rothwell, 81 N.M. 166, 464 P.2d 896 (1970); Hondo Oil & Gas Co. v. Pan American Petroleum Corp., 73 N.M. 241, 387 P.2d 342, 15 A.L.R.3d 437 (1963). Applying these rules of construction to the written lease, voluntarily negotiated and executed by the parties, we are required to hold as a matter of law that paragraph 2 gives to Humble the contractual right to terminate the lease.

In a case quite similar to ours, Stalvey v. Pure Oil Co., 234 F.Supp. 185 (E.D.S.C. 1964), aff'd 346 F.2d 1009 (4th Cir. 1965), the trial court held that the lessee of a service station was entitled to cancel the lease because the use of the premises was impaired by the widening of the adjacent highway, and stated:

"And if the use of the premises for the sale of petroleum products to motor trucks, and the servicing of the same is limited, suspended, affected or impaired, then its use as a 'service station' is obviously limited, suspended, affected or impaired.

"It is readily apparent that the purpose of the Lease was the operation and maintenance by the Defendant-Lessee of a service station or filling station on the premises. 'Use of the leased premises' was nothing more than the transacting by defendant of such business; the selling of products and furnishing of services to motor vehicles."

After discussing the terms of the lease, the termination clause of which was narrower in scope than the termination clause in our case, the court said:

"The defendant's use of the premises, therefore, was not confined to the described lot; but included all 'appurtenances' or 'adjuncts' (such as the pump island which was necessary to its enjoyment), and such easements, rights, privileges or licenses as the Lessor had in the adjoining streets, and the use thereof (such as the privilege of exit and entrance, and parking).

" 'Appurtenances' or 'adjuncts' include everything essential or reasonably necessary to the full beneficial use and enjoyment of the demised premises. Whatever easements or privileges appertain to the demised premises, and are used and enjoyed in connection therewith ordinarily pass with the demise.

" * * *. The Lease Agreement clearly indicates that the acts or actions or changes affecting the use of the premises need not be confined to the described lot, nor directly operate thereon. The pump island and parking area were obviously used in connection with the described lot (as was the Highway itself for customer entrance and exit) and necessary to the business transacted thereon. Removal of the island and disruption and discontinuance of parking would certainly affect or impair, or limit the use of the lot or premises. It is apparent from the record that the location of the pump island and its use in connection with the leased premises, and the condition of the Highway, were all known to the parties, and within their contemplation at the time the Lease Agreement was entered into. * * *"

In affirming the district court's judgment, the Fourth Circuit Court of Appeals also took note of the fact that difficulty of maneuvering into the service station area was an additional restriction of use to be considered, as was the elimination of the use of adjacent lots as previously utilized before the highway improvement. In final dismissal of allegations that the lessee's knowledge and use of right of way previous to the altered conditions made invalid its claim of termination under the lease agreement, which are similar to the allegations made here by Waxler, the court stated:

"Furthermore, we see no merit in the lessor's contention that no right of cancellation arose upon the occurrence of the highway improvements because those improvements merely made it impossible for the lessee to continue operating its business within a highway right-of-way of which it had actual notice at the time the lease was executed. * * *

There is uncontradicted testimony that at the time the lease was executed, the lessor was using and for some time theretofore had been using the area in front and to the side of her lot in operating the service station because the full rights-of-way shown on recorded real estate plats were not being utilized for street and highway purposes. As a matter of fact, at the time the lot was leased, the lessor's gasoline pump island was located entirely within the acknowledged highway right-of-way. Under these circumstances, it was altogether reasonable for the lessee to insist that it have the right to cancel if these conditions were changed to its detriment, and we think the language in the lease agreement effectively gave the lessee the protection it desired."

See also, Orme v. Atlas Gas & Oil Co., 217 Minn. 27, 13 N.W.2d 757 (Minn.1944); Buell v. Indian Refining Co., 62 Ohio App. 108, 23 N.E.2d 329 (1939).

In our case, both the oil mat which extended on to adjacent property, and the outer service lane of the single pump island, were used in the service station operation prior to the time of the lease and the construction project, and thereafter were completely impaired and no longer available. There can be no question but that a severe and permanent restriction of use resulted. In the absence of language in the lease to the contrary, the events and subsequent impairments which have occurred are well within the termination option given to Humble under paragraph 2.

Disregarding disputed facts, and based only on the unchallenged findings of the trial court and uncontroverted evidence of permanent restriction of use, the court's conclusion of law No. 8 that paragraph 2 of the lease agreement did not give Humble the right to terminate the lease constitutes reversible error. Humble's requested conclusion of law No. 5 to the effect that the restriction of use resulting from the highway project entitled it to cancel the lease pursuant to the terms of paragraph 2 should have been granted. The judgment must, therefore, be reversed and Waxler's complaint dismissed with prejudice.

It is so ordered.

COMPTON, C. J., and McKENNA, J., concur.